**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**TAMEKA ROGERS,**

Plaintiff,

v.

**MORGAN & MORGAN,**

Defendant.

CIVIL ACTION NO.: _____
JURY TRIAL DEMANDED



1: 25 -CV- 5 4 3 5

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

(Title VII of the Civil Rights Act of 1964)

### I. JURISDICTION AND VENUE

1. This is an action for employment discrimination and retaliation under **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §2000e et seq.

2. Jurisdiction is conferred upon this Court pursuant to **28 U.S.C. §1331** and **42 U.S.C. §2000e-5(f)(3)**.

3. Venue is proper in this Court because the events giving rise to these claims occurred within the **Northern District of Georgia.**

### II. PARTIES

4. Plaintiff **Tameka Rogers** is a resident of Georgia and a former employee of Morgan & Morgan.

5. Defendant **Morgan & Morgan** is a national law firm operating in Georgia and may be served through its registered agent.

### III. ADMINISTRATIVE EXHAUSTION

6. Plaintiff filed a timely charge of discrimination and retaliation with the **Equal Employment Opportunity Commission (EEOC).**

7. Plaintiff received a **Notice of Right to Sue** dated [INSERT DATE] and files this Complaint within 90 days of receipt. *(Attach as Exhibit A.)*

## IV. STATEMENT OF FACTS

8. Plaintiff was employed as a **Case Manager Lead** and performed her duties with excellence, as evidenced by consistent high performance and monthly bonuses.

9. Plaintiff engaged in **protected activity** by reporting discrimination, workplace hostility, and unequal treatment to Human Resources.

10. Shortly thereafter, Plaintiff was denied a raise and office space, excluded from meetings, and isolated within the workplace — a clear pattern of adverse treatment.

11. Defendant failed to take corrective action and instead allowed a hostile and retaliatory environment to persist.

12. Plaintiff was forced to resign due to this treatment, which constitutes a **constructive discharge**.

## V. CLAIM 1: RETALIATION UNDER TITLE VII (<u>42 U.S.C. §2000e-3</u>)

13. Plaintiff engaged in protected conduct when she reported discrimination.

14. Defendant took adverse employment actions against Plaintiff shortly thereafter.

15. The timing and context of these actions establish a causal link between the protected activity and the retaliation.

16. Defendant's conduct violated Title VII's anti-retaliation provisions.

## VI. CLAIM 2: RACE DISCRIMINATION UNDER TITLE VII (<u>42 U.S.C. §2000e-2</u>)

17. Plaintiff is African American and was subjected to disparate treatment based on her race.

18. Following race-related complaints, Plaintiff experienced heightened hostility, denial of resources, and was treated differently from similarly situated non-Black employees.

19. Defendant failed to provide equal treatment and fostered a racially hostile work environment.

20. This conduct constitutes unlawful race discrimination in violation of Title VII.

---

## VII. PRAYER FOR RELIEF

Plaintiff respectfully requests that this Court:

A. Grant a trial by jury;

B. Award compensatory damages for lost wages and emotional distress;

C. Award punitive damages for willful misconduct;

D. Award reasonable attorneys' fees and costs (if applicable);

E. Grant any other relief the Court deems just and proper.

---

**Respectfully submitted,**

*Tameka Rogers*
[Your Address]    122 Legacy Oaks Circle, Roswell GA 30076
[Phone Number]    229 4396672
[Email Address]    tamekaerogers@gmail.com
*Pro Se Plaintiff*

**Tameka Rogers**

**122 Legacy Oaks Circle**

**Roswell, GA 30076**

**Charge No: 410-2024-13806**

## EEOC Review Limitations & Plaintiff's Position

Plaintiff acknowledges receipt of the EEOC's Notice of Right to Sue dated [insert date], issued without a determination of cause.

However, Plaintiff contends that the EEOC's limited review failed to account for the full scope and depth of submitted evidence,

including witness corroboration, documented retaliation, HR misconduct, coercive management practices, and performance-based

records that undermine Defendant's proffered reasons for adverse treatment. The decision to issue a neutral Right to Sue does

not reflect the strength of the Plaintiff's claims, which are now supported by extensive exhibits and factual documentation and

are more appropriately addressed before a jury in federal court.

## EEOC Review Limitations & Plaintiff's Position

Plaintiff acknowledges receipt of the EEOC's Notice of Right to Sue dated [insert date],
issued without a determination of cause.

However, Plaintiff contends that the EEOC's limited review failed to account for the full
scope and depth of submitted evidence,

including witness corroboration, documented retaliation, HR misconduct, coercive
management practices, and performance-based

records that undermine Defendant's proffered reasons for adverse treatment. The decision
to issue a neutral Right to Sue does

not reflect the strength of the Plaintiff's claims, which are now supported by extensive
exhibits and factual documentation and

are more appropriately addressed before a jury in federal court.

## EXHIBIT BINDER

TAMEKA ROGERS v. MORGAN & MORGAN

U.S. District Court – Northern District of Georgia

Civil Action No.: _____

### Table of Exhibits

• Exhibit A – EEOC Notice of Right to Sue

• Exhibit B – Evidence of Outstanding Performance, Bonus Eligibility, and Constructive Discharge

• Exhibit C – Retaliation, HR Breach, and Misleading Employer Narrative

• Exhibit D – Final Email Leading to Constructive Discharge and Retaliation Evidence

• Exhibit E – Pay Stubs Showing Bonus and Final Compensation

• Exhibit F – Comparison Chart of Treatment vs. Similarly Situated Employees

• Exhibit G – Timeline of Protected Activity and Adverse Employment Actions

• Exhibit H – Employer Position Statement and Rebuttal

Each exhibit should be clearly labeled and attached in order. Ensure all documents include relevant dates, headers, and identifiers for cross-reference in the formal complaint.

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Birmingham Direct Dial: (205) 651-7020
FAX (205) 212-2105
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: June 26, 2025

**To:** Tameka Rogers
122 Legacy Oaks Circle
Roswell, GA 30076

Charge No: 410-2024-13806

EEOC Representative and email:    Richard Musgrave
Federal Investigator
richard.musgrave@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 410-2024-13806.

On behalf of the Commission,

**SHERI GUENSTER** Digitally signed by SHERI GUENSTER
Date: 2025.06.26 14:45:12 -05'00'

/for Bradley A. Anderson
District Director

Cc:
Luis Santos
FordHarrison LLP
401 E Jackson St., STE 2500
Tampa, FL 33602

Please retain this notice for your records.

VIA EEOC RESPONDENT'S PORTAL (RICHARD.MUSGRAVE@EEOC.GOV)

Richard Musgrave, Investigator

U.S. Equal Employment Opportunity Commission Birmingham District Office

1130 22nd Street South Suite 2000

Birmingham, AL 35205

Re: Morgan & Morgan's Position Statement against: Tameka Rogers

EEOC Charge No.: 410-2024-13806

Respondent: Tameka Rogers

December 31, 2024

Dear Investigator Musgrave:

This Rebuttal Statement is submitted on behalf of myself, Tameka Rogers, former Case Manager Lead at Morgan & Morgan, Alpharetta, GA., in response to the Final Position Statement submitted by Morgan & Morgan to the above-referenced EEOC Charged. I am submitting with my statement emails that I forwarded to my personal email (tamekaerogers@gmail.com) from my former email (terogers@forthepeople.com) with Morgan & Morgan to prove that the Position Statement submitted by Morgan & Morgan is false including mis-leading information and full of statements that lack integrity and truth.

I will also forward audio recordings that I felt the need to record, once I discovered the low morale and lack of trust with the firm's HR director, Brian Nason, Jeanette Galo and Attorney Isabella Stanton.

I am confident that once you read the emails along with my rebuttal statements, you will find that my charge is proven with these facts and that Morgan & Morgan is in violation of the Title VII of the Civil Rights Act of 1964 ("Title VII") and that my resignation was a Constructive Discharge, for intolerable working conditions, a pattern of negative employer actions that were persistent and never resolved by Human Resources. I urgently ask the EEOC to Morgan & Morgan with unlawful retaliation.

# 1. Charging Party's Rebuttal Statement to Hire, Employment and Pay with Morgan & Morgan (Section A: Charging Party's Hire and Employment)

On October 2, 2023, I was hired by Morgan & Morgan as a Case Manager. My starting pay rate was $15.00, below the market starting rate for a Case Manager. I worked at the Alpharetta, Georgia location under supervision Morgan and Morgan in the (Georgia/Atlanta Market with the firm, and she was very skilled and knowledgeable with the laws and compliances of working cases in Georgia. When she was transitioned to work in Boston Market, she also had to receive training within the Boston market to learn how to work those personal injuries cases according to Boston law, insurance and state compliance.

During this training period, all Case Managers were assigned cases to work in which many of those cases were between 1-2 years old, approaching SOL (statute of limitations) and the cases faced tremendous negligence due to lack of staffing of Case Managers in the State of Boston, MS.

The firm was working towards building this new market, full of cases that were not worked properly by previous attorneys and Case Managers, and many of the clients were angry because their cases were not settled or handled properly. This was due to the firm's poor staffing and high turnovers with employees.

I learn the job skill quickly, and evolved as a Case Manager, only to discover that Morgan & Morgan was not paying all Casse Manager the same, and we all were doing the same job. This pay issue became a problem for the firm, and they were forced by the Georgia Department of Labor to increase pay according to market rates. I received my increase (to my memory) around February/March 2023. We were told that we would receive back pay but never received it.

Between the month of March/April 2023, my supervisor, Jeanette Galo, Case Manager Lead at that time, mentioned the firm was expanding the Boston market, she was being offered a new position as Pre-Suit Operations Manager and stated my name came up by Steve Kim, who wanted me to take her position as Case Manager Lead.

## 2. Charging Party's Rebuttal Statement to Section B (Charging Party's Performance Declines After Promotion to Case Manager Lead)

During my first 6 months of employment, I was promoted to Case Manager Lead.  On my birthday, April 7, 2023, I was offered the position of Case Manager Lead. When I accepted my promotion, Jeanette Galo had not yet stepped into her position as Pre-Suit Operations Manager. She was still considered Sr. Case Manager Lead, and her title role as Case Manager Lead in the Litify system and on employer emails. I was still under her leadership, and she was still my direct supervisor. Upon receiving the promotion, I was added in the same system and my new title was changed to Case Manager Lead by

Steve Kim and HR, and the title Case Manager Lead was added to my email's signature name. When Ms. Galo saw the firm added "Case Manager Lead" to my name on the email, and in the system, she requested it to be removed immediately.

About a month after my promotion, she had a conversation with me stating the following:

1. Do not ask for a pay raise, because you will not get it.
2. Do not ask for your own office space, because I will not approve it, and stating, to me: "you are not like all the other Case Manager Leads".

**All other Case Manager Leads who were promoted in the firm received pay raises and their own private office. I was immediately denied both, however, I continued to work hard and to prove my skills and ability to lead the team of Case Manages who were assigned to me.**

The Boston Market within the firm had a total of 11 Case Managers during this time. Steve Kim and Jeanette Galo divided the team. I was given 6 Case Managers to supervise. Their names were:

Myles M. , Karly Perkins, Sofia R., Claudette, Simone and Irene Lopez.

Ms Galo had a total of 5 Case Managers on her team; however, she was still in training to be Pre-Operations Manager and was in charge of ensuring I was trained and evolving as a Case Manager Lead.

Around the last two months of April, Jeanette Galo went on a two-week vacation to Morocco, Africa. I was left to oversee the entire Boston Team. During this time, Steve Kim asked that I work with the entire team to bring progress scores to compliance on cases. Both teams were failing tremendously below percentage.

I demonstrated great leadership and improved all scores within two weeks for the entire Boston Market. During the two weeks Jeanette Galo was out of the office, she would call and email team members, asking how I was handling my duties with her being absent.

Also, I received an anonymous text from someone on the team that stated, "Jeanette doesn't like you and when she returns, she will try to get you fired, because she doesn't want you to be a Case Manager Lead".

I later shared the text with upper management to investigate. During the next few weeks, I noticed aggressive behaviors and comments Ms. Galo would make towards other Case Managers like "If I don't like someone, I get them fired" "I don't want any weak people on my team". Those statements lead me to further believe the text I received was true.

There was no time during this period when I failed to demonstrate leadership skill, nor did I fall behind on my caseloads. Although I was still withing my first 60 days as a new Case Manager Lead, I worked my case into settlement ready status. My performance did not fail. I monitored my cases as well as my teams' cases. No verbal, or written warnings were ever given to me during my time of employment on performance to back their statements. Their position statement is false and misleading and proves they are

trying to create doubt against my claim of retaliation and base my decision of resignation on performance, when that was not the reason.

# Charging Party's Rebuttal Statement to Section B, point (1)

Morgan and Morgan state on their position statement the following: **On June 19, 2024, Ms. Galo sent Charging Party a list of fourteen (14) cases which had not been settled per the supervision and direction of Attorney Stanton or transferred to Attorney Stanton for possible litigation in the previous six (6) months. Per Firm policy, cases must be "moved" within 180 days of sending a demand, but the fourteen cases in question just sat idle. Charging Party did not acknowledge Ms. Galo's list or otherwise respond to Ms. Galo's inquiry – despite her role requiring communication, and proactive monitoring and movement of cases.**

**My Response:**

There is nothing documented that I failed to settle cases. All Case Managers were given cases that were not settled because the cases we received were cases that were not completed by previous Case Managers and Attorneys who left the firm. From the start time of my employment with Morgan & Morgan (October 2, 2023 until my promotion, (April 7, 2024) the firm switch cases and reassigned attorneys at least 4 different times, which made it difficult to discover and resolve issues in all cases due to their instability and disorganization.

On June 19, 2023, as a new Case Manager Lead, I was still in training in my new position. The entire Boston team, including Ms. Galo had not received complete training on how to settle cases. The cases were all being settled by the attorneys who all were stationed in Boston and who were assigned to the cases along with their accounting team which was station in Boston. Cases that were not settle were not settled because the Attorneys in Boston and previous Case Manages assigned to 90% of those cases failed tremendously. Ms Galo or I and all Case Manager working in the Boston Market, did not receive proper training on how to settle cases until the end of July leading into the month of August 2023.

A few responsibilities as well as my teams were to do the following:

1. Ensure Intake provided all accurate information concerning the client's accident and injuries

2. Ensure Client Advocacy (a department within the firm) had established treatment for the client

3. Ensure all clients were treated and/or treating with a medical provider for their injuries; discover if client received MRI, or Surgery or Injections. Document case files accordingly.

4. Investigate injuries to see what type of case the client has and to confirm if he needs immediate litigation or should it remain in pre-suit.

5. Verify and establish liability claims with the "at fault "party insurance carrier, document policy limits in litify system

6. Make client contact calls 30 days

7. When the client has completed treating for their injuries; request Bills and Records from medical providers, document info in the system

8. Create a demand to send to adjuster for settlement.

9. Initiate and negotiate offers from the adjuster, and when it has been approved by the attorney and client, the case was then passed to the attorney to complete all remaining steps for settlement.

Their Position Statement is not supported by any proven evidence.

This case management process took place until all proper training was provided to me and my team which did not take place until August 2023. The position (1) is a very untrue statement and should be dismissed as it proves my claim of retaliation against Jeanette Galo and Attorney Isabella Stanton. To further confirm their statement (1) stating on June 19, 2024, proves that this company is in retaliation against the charging party because on **June 4, 2024,** after witnessing Ms. Galo's and Attorney Stanton's unlawful behavior in the workplace; and after sending a few emails to managements, with no resolution, I submitted an official complaint to HR which is dated before, (June 19, 2024) their alleged poor performance allegation against the charging party.

**(See exhibit 1: Summary of Concerns and Email sent to Brian Nason, HR Director)**

Their Position Statement is not supported by any proven evidence.

This case management process took place until all proper training was provided to me and my team which did not take place until August 2023. The position (1) is a very untrue statement and should be dismissed as it proves my claim of retaliation against Jeanette Galo and Attorney Isabella Stanton. To further confirm their statement (1) stating on June 19, 2024, proves that this company is in retaliation against the charging party because on **June 4, 2024,** after witnessing Ms. Galo's and Attorney Stanton's unlawful behavior in the workplace; and  after sending a few emails to managements, with no resolution, I submitted an official complaint to HR which is dated before, (June 19, 2024) their alleged poor performance allegation against the charging party.

**(See exhibit 1: Summary of Concerns and Email sent to Brian Nason, HR Director)**

 **Gmail**

Tameka Rogers <tamekaerogers@gmail.com>

---

## Complaint

---

**Tameka Rogers x35218** <terogers@forthepeople.com>
To: Tameka Rogers <tamekaerogers@gmail.com>

Wed, Sep 18, 2024 at 1:08 PM

### Tameka Rogers
**Case Manager**

**T:** (770) 299-7705
**F:** (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



$20B+ Recovered • 1,000+ Attorneys • 120+ Offices

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

---

**From:** Tameka Rogers x35218 <terogers@forthepeople.com>
**Sent:** Tuesday, June 4, 2024 9:14 AM
**To:** Steve Kim x31741 <skim@forthepeople.com>; Brian Nason x1804 <BNason@forthepeople.com>;
Ryan Lang x8619 <rlang@forthepeople.com>
**Cc:** Tameka Rogers <tamekaerogers@gmail.com>
**Subject:** Complaint

Good morning.


Please find the attached complaint.


This complaint is driven by the low morale in leadership, dishonesty, manipulation and lack of integrity--- with Ms. Jeanette Galo. I have a record of emails I made where I have tried to resolve this in conversation, get direction on how to handle it without reporting it to HR but when I request meetings, no one responded yesterday while I was at work.

I know you all are very busy, and I understand, but as an employee-- my burden is very heavy as well. I have great respect for you all included in this email, but this complaint is necessary.

Telling the truth often makes other angry with you and some may even hate you for it, but I am willing endure all of that---for what I believe is right.

I did not ask to be a Case Manager Lead, although I am *extremely honored* to be in this position, and desire to continue in this position ---there are some things that need to be revealed.

If you desire to meet with me, I am fine with that. I hope to hear your thoughts concerning this.

Sincerely,

**Tameka Rogers**
**Case Manager**

**T:** (770) 299-7705
**F:** (770) 299-7755
11605 Haynes Bridge Road, Suite 490,
Alpharetta, GA 30009



$20B+ Recovered • 1,000+ Attorneys • 120+ Offices

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

**2 attachments** — Download all attachments

 **mmlogo_4d481f35-1840-4531-86f0-09098b1154be.png**
5K View Download

 **Summary of my Complaint.pdf**
124K View as HTML Download

Summary of Complaint Letter  Submitted to HR (attached the to email above

After accepting the Case Manager Lead position on April 7, 2024, by Jeanette Galo, approximately 1.5 weeks later, she went on a 2 weeks' vacation and I was left to lead the Boston market team overseeing 12 Case Managers in which the following were assigned my team who are: Claudene, Simone, Myles, Karla, Sophia, Irene.

What I discovered during that time with my team, particularly was their Case Progress Percentages, were extremely low. I met with the team daily to get an understanding of what they understood about their jobs and what they didn't understand. To my discovery, the team did not know the importances of the Matter Details page in litify and the areas that needed to be completed such as: Liability, MRI, Ortho, Surgery, Treatment, MCP and Coverage. At that time, my team had been employed with Morgan & Morgan for about 60 days to my understanding. It appeared no one had ever explained the Matters Detail page to them and how it affects their Case Compliance percentage nor the importances of having those mentioned areas verified by the client and through the investigation process of their cases.

The team also struggled tremendously with noting the files, logging calls, and somewhat retaining information to provide quality case management. Although I saw a great effort and wiliness to learn, they seem completely confused on the overall case progress and management. Within 1 week time, I helped the team bring scores from 40 and 60 percent-- to over 90 percent with accurate documentation of the case. I sent an email out to the attorney and cc other management, including Ms. Galo, to reveal their incredible progress. Within the 2 weeks, I continued to hold morning meetings to get an idea of what they understood and what they were confused about.

As the days move on, I saw an increase of motivation and determination to get cases in compliance and set weekly goals.

I placed my **contact number** in the Microsoft Teams—so if any CM need to call out or be late for work, they had a way of communicating with me. The day afterwards, I received a text from an identified person who stated Ms. Galo has two CM spying on me, and to be careful with her and not to trust her. I ignored the text—and decided to focus on what I could do for the team and for Boston. I never disclosed to anyone I received that text, until later. I moved forward with one goal in mind—and that was to help my assigned team evolve. I also assisted Ms. Galo's team as needed while she was away on vacation. Moving forward...

When Ms. Galo returned from her 2-week vacation, she was adamant about letting me know, with her domineering personality, she was my boss and that her emails and requests from my assigned team was more important than mine emails and team's messages to them. I told her, I respect what she was saying but at the end of the day—if Attorney Isabella give me instructions for the team, her words and instructions should have priority, since my team is working her cases, etc. ---and that I will need to covey what she wants to know without interruption.

Ms. Galo, many times would tell a few CM's, to come to her with all questions and not me, which then brought some discomfort and confusion to my team because they didn't know if they should report their questions to me or to her. Ms. Galo would reach out to Attorney Isabella for information about the team, without including me, which left me in a blind spot about my team. A great divide was starting as a result of this. As a new Case Manager Lead, I felt it was important for me to be included in conversations about my team so that I

could learn and help discover their case needs and what I needed to do---to push them forward.

After being told by Attorney Stanton that my team was doing great---Ms .Galo called me into the office with a list of complaints about a few of the CM's on my team—stating her and Isabella have decided to send an email to all upper manager and that the email serves as a warning for my entire team. I said with great confusion, "A warning???" Why?" My concern was---why is the entire team getting a warning when I know the entire team combined are struggling with the same case issues. I felt my team was targeted for bad performance.

After the email was sent on May 3, 2024—I replied to Ryan Land and Brandon Gavin, who were included in the email, around May 5, 2024---stating I disagree with how the email was sent and it's conflicting. Two days later, I had a brief discussion with Brandon Gavin , who reach out about it—and he provided encouragement and stated if any other issue arises to let him know.

Days after, Ms. Galo came to me and said; "for now you (referring to me) will be in charge of both teams and be my voice on the floor". I had no idea why she instructed this, but I did what she asked of me.

She would often direct me on what to say in the whole Boston Team message center and I would covey. During this time, I had no time to even look at my cases, talk to clients or return calls. I did the best I could as Ms Galo stated to me, "put the team is first, you are last". So I did.

Each day, I was answering CM questions about their cases, assisting them with their cases-- on both teams. I was more familiar with how Attorney Isabella ran her cases but not Attorney Justin—so when I would say to a CM on her team, "I don't have the answer— please speak with Jeanett or reach out to your attorney (Justin) to see how he'd like to handle this, they would tell Ms Galo, --I did know the answer and she would say, "as a CML, you need to know the answers to all questions asked of you by CM or you can't be a Case Manager Lead".

That is impossible for a new CML who I, was only at that time a new CML under my first 30 days, and who only knows what one attorney requires for their team, which is not the one I am assigned to.

On May 1, 2024. I received another text from an unidentified CM stating, to be careful and not to trust Ms. Galo she's trying to get me fired—and that she was telling people I don't take baths and that I stink."

I asked the person to identify themselves and to call me, they never did.

I was very distressed, in tears as I reported the text to Amanda, who has always been kind and left an open door for me to come into her office to talk about work issues and other work-related things--- and later that morning I reported the text to HR, Mr. Nash. When Ms Galo discovered I spoke to Amanda first and not her—she became upset with me and stated I am never to go back to her office for anything and if I do, she was going to move me to work in the Georgia market.

She wanted me to delete the numbers and only do scene shots of the messages to keep. She asked me to give a copy of the message to Amanda so she and Steve could investigate and so they could fire whoever sent the messages.

I didn't feel comfortable doing that for the following reasons:

1.  I did not like the fact she became upset because I reported the issue to Amanda and not her first and then asked me to delete the numbers.

2.  What if the person in the text is telling the truth—and got fired over doing what they felt was the right thing to do. Will they cover it up? At that moment I develop trust issues with some mgt about that situation.

3.  Some of the words in the text reminded me of a concern I texted to Amanda in February---so at that point I was wondering if what was written in the text messages was true.

Fast forwarding....

However, in the times between, Ms. Galo following statements to me that sparks much concern about low morale and leadership integrity.

I will list them and provide my thoughts.

1.  Ms. Galo told me I will not get a raise for my new position as CML and not to ask.

2.  I cannot have an individual office because I am not like the other CML's in the office, they earned to have their own office, I have not.

3.  When the word "Lead" was added to my name on the email, as "Case Manger Lead"; she brought it to my attention and the next day it was removed. I asked why, she stated, "they haven't changed my title to Ops Manager yet" sinuating that until she gets her new title, I cannot get mine.

4.  I have heard Ms. Galo state on multiple times: "When I don't like someone; I get rid of them, and I always get what I want."

5.  Ms. Galo has used Mr. Evan Rosenburg's name multiple times as her power to get what she wants---and that she doesn't report to anyone in the office but him.

6. She has made statements like, Mr. Brian Nash is nothing and has no real power within the company and that he has to be told what to do—before he does anything, so don't go to him.

7. When Sopia sent an email to MR. Nash complaining she (Sopia) mentioned Steve's name in the email complaint, and when Steve forwarded the email to Ms. Galo to read, she brought me into her office and shared the email with me with Steve replying, "SMMFH"—stating his frustration with why Sophia would send such email and that moment Ms. Galo wanted to fire Sopia from her position stating she is causing trouble against Steve for sending the email, she then asked me to write down all the days I knew she called into work, and she wanted to build a case against her to get her fired.

She asked me the same day to send an email to HR, Brian Nash about Sophia's absence etc, I sent the email and I also let Mr. Nash know---Jeanette Galo asked me to send the email, to cover myself, as I felt she should have sent the email and not me.

8. She disclosed to me in an earlier situation, (before I was Case Manager Lead) that Sophia was claiming Sexual Harassment against another Case Manager, Karla for sending her naked pictures. She asked my thoughts on it because she was given the task to investigate it.

9. Ms. Galo made the following statement saying: "We minority women, we need to show the white man we can do this job—they already think less of us"

10. I was told for two weeks from May 13-27 I was not allowed to communicate with my team, and they could not ask me any question and I needed to lower my inventory and that I would return to the floor on Tuesday after Memorial Day.

When I returned to the floor, on Tuesday May 28, 2024--she brought me into her office complaining about Karla, Myles and Simone.

Karla, who I agree with have issues with retaining information, handled a WC case incorrectly, after being told how to handle it---which made Jeanette and Isabella very upset, within their right.

Jeanette at that moment wanted to fire her but stated Steve wouldn't allow her to, stating he (Steve) wants us to take the time to build those CM's and not be so quick to fire them. I told Ms. Galo I agree with Steve's logic, and we should follow his leadership.

Ms. Galo went against what Steve desired and wanted me to send an email to her , Isabella and Steve and to Simone particularly as a verbal warning on performance for their cases. She also wanted me to include Myles but changed her mind stating only to include Karla and Simone, but to do it is separate emails. I sent the emails as I was instructed and forgot to add Steve so I forward one of the emails to him.

Karla was in tears, and when I told Jeanette she stated she didn't care, and she is a weak link on her team, and she needs to go. She wanted me to start writing down everything she does wrong to build a case against her to convince Steve she needs to be fired. Those were her words.

On Friday May 31, 2024, Ms Galo told me we were getting 3 new Case Managers and that we need to walk over and meet them. As she introduced them to me—we walked away and she said these words to me: " the two younger females will be on my (Jeanette) team, and you (Tameka) take the older white woman, Melanie. I don't want no old white woman on my team, I don't have the patience. She went on to say, I wonder how she will feel working under two minority women, one brown skin black woman and the other Muslim.

Around midnight Friday night, with great burden, I sent an email through the work email to Ryan Lang and Brandon Gavin, stating, I don't think I can work with Jeanette and I wanted to have a meeting to discuss concerns.

On Sunday June 2, 2024, I received a call from Karla who shared some surprising information with me about Jeanette Galo, including the following:
She said, she and I (Jeanette) use to be very close, stating Jeanetta has shared some things about her marriage with her and how Ms. Galo husband is younger than her and even shared some details about their sex life with Ms.Karla.

Ms Karla stated the conversations made her uncomfortable and that she began to pull back and when Jeanette saw she was no longer interested in hearing details about her life—she then felt Ms. Galo was working against her at work making things hard for her. I was in total shock upon hearing her discuss this with me. Karla told me, Do not trust Jeanette sis!

I did share a certain management concerns with Karla about Ms Galo statement concerning Melanie (the white CM) and told her I wasn't' sure how to handle it . At that point, I told Karla—it was only so much I could say and pulled away from the conversation.

For a moment, I was wondering if that call from Karla was a set up. She also stated, Ms. Galo was mad because she was talking to Mr. Brian Nash on Friday at her desk.

The next day, Monday June 3, 2024. To my surprise, Ms. Galo changed her mind about placing Melanie on my team and moved her to her team. Ms. Galo's demeanor had changed—and to my understanding, she was aware I was going to make a complaint about her. So, at that point, I understood.

In closing,

If you'd like to meet and discuss this statement, I'm ok with it.

I hope you understand, that in order to support my statement, I had to add names of individuals, like yourselves, not with the intent to cause confusion but to reveal a necessary truth. This is just a summary of my complaint and issue with my leadership -- that is of great concern.

Humbly,

Tameka Rogers

Case Manager Lead, Boston Market

Morgan & Morgan

End of Summary of Complant Letter

 **Gmail**                                   **Tameka Rogers <tamekaerogers@gmail.com>**

## Response to Our Meeting

**Tameka Rogers** <tamekaerogers@gmail.com>                              Wed, Jun 26 at 7:17 PM
To: Brian Nason x1804 <BNason@forthepeople.com>, <terogers@forthepeople.com>

Good day Mr. Nash.

Thanks again for taking the time to meet with me today.

I wanted to ensure I gave a clear response to your question: "What is the outcome I expect to see happened with my written complaints/concerns to you"

Let's say I'm in Jeanette"s position as Ops Manager, Melanie Waters is my CML and Jeanette Gale is the new Pre Suit/CM.

What if I would  have said to Melanie my CML, who is white , that I don't want Jeanette who is Muslim/Hispanic to be on my team because she's old and Muslim, and then say, "I wonder how she's gonna feel working under a black and white manger"—what would be the outcome for me saying this at work?

What if I said to my CML, after Steve said, "we are not firing CM's because they are struggling with cases, " and I say, I will fire them...I always get what I want...."

What would be my outcome?

What if I said to my CML, after my CML asked me about getting "work at home access permission" —about YOU, HR director, —-"he's nothing, so don't go to him for anything "....

What would be my outcome?

So to answer your question,—- whatever the outcome would have been for me if I were the one doing this, ;and all that I stated in my email) then it should happen to her. My thoughts.

But you decide. You're the HR Director. I respect whatever way you chose to deal with this.

Your concern for my concerns are noted and appreciated.

Kindest Regards,
[Quoted text hidden]

## Morgan & Morgan Rebuttal Matrix

| Morgan & Morgan Claim | Legal Supported Evidence | |
|---|---|---|
| You never alleged race discrimination or harassment to HR on June 7, 2024; your complaints were only about staffing changes, raise, and office space. | Email and witness testimony show you explicitly reported discriminatory treatment and hostile environment to HR on June 7, 2024, referencing race-based comments and denial of fair treatment. | EEOC v. Total Sys. Servs., Inc., 221 F.3d 1171 (11th Cir. 2000) ? Informal internal complaints of discrimination are protected activity under Title VII. |
| Comments ('not like anyone else' and 'old white lady') are stray remarks unrelated to any decision-making. | Comments were made by your direct supervisor during employment, reflecting bias. Courts allow circumstantial evidence to establish discriminatory intent, especially when made by decision-makers. | Ross v. Rhodes Furniture, Inc., 146 F.3d 1286 (11th Cir. 1998) ? Discriminatory remarks by decision-makers can be evidence of discriminatory intent. |
| No adverse employment action occurred; you resigned voluntarily and were not denied any available bonuses. | After complaint, you were denied training materials, subjected to increased scrutiny, and denied a bonus opportunity provided to others. Resignation was due to intolerable conditions amounting to constructive discharge. | Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006) ? Retaliation includes actions that would dissuade a reasonable worker from making a charge; constructive discharge can qualify as adverse action. |
| Your resignation on October 2, 2024, was voluntary, and you expressed gratitude at the time. | Contemporaneous emails and records show you experienced escalating hostility and retaliation after protected activity; resignation was a last resort due to ongoing harm. | Pennsylvania State Police v. Suders, 542 U.S. 129 (2004) ? Constructive discharge occurs when working conditions become so intolerable that a reasonable person would feel compelled to resign. |
| Feedback and reminders from your supervisor were normal supervisory communication, not harassment. | Post-complaint, frequency and tone of communications changed to punitive and exclusionary, with denial of resources and opportunities necessary to perform your role. | Gowski v. Peake, 682 F.3d 1299 (11th Cir. 2012) ? Retaliatory hostile work environment is actionable when conduct, taken as a whole, is severe or pervasive enough to alter employment conditions. |

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm. In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

*To make a FOIA request for your charge* **file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 410-2024-13806 to the District Director at Bradley A. Anderson, 1130 22nd Street South Suite 2000, Birmingham, AL 35205.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 410-2024-13806 to the District Director at Bradley A. Anderson, 1130 22nd Street South Suite 2000, Birmingham, AL 35205.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

EEOC Form 5 (07/24)
I declare under penalty of perjury that the above is true and correct.

Digitally Signed By: TAMEKA ROGERS
09/25/2024
_____
Charging Party Signature & Date

NOTARY – When necessary for State and Local Agency Requirements

_____
I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, and belief.

_____
Signature of Complainant
Subscribed and sworn to before me this date: _____

CP Enclosure with EEOC Form 5 (06/24)

## PRIVACY ACT STATEMENT

Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (06/24).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so *within 15 days* of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA, Section 207(f) of GINA, and 42 USC 2000gg-2(f)(1) of the PWFA it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

# FORDHARRISON

401 E. Jackson Street | Suite 2500
Tampa, Florida 33602
Tel 813-261-7800 | Fax 813-261-7899

Writer's Direct Contact:

LUIS A. SANTOS
813-261-7852
lsantos@fordharrison.com

December 16, 2024

**VIA EEOC RESPONDENT'S PORTAL
(RICHARD.MUSGRAVE@EEOC.GOV)**

Richard Musgrave, Investigator
U.S. Equal Employment Opportunity Commission
Birmingham District Office
1130 22nd Street South
Suite 2000
Birmingham, AL 35205

      Re:    Charging Party: Tameka Rogers
             EEOC Charge No.: 410-2024-13806
             Respondent: Morgan & Morgan

Dear Investigator Musgrave:

      This Statement of Position is submitted on behalf of our client, Morgan & Morgan Atlanta, PLLC ("Morgan & Morgan" or the "Firm"), in response to the above-referenced Charge of Discrimination (the "Charge"). We are confident that once you have had the opportunity to review this response, you will agree that this Charge should be dismissed, absent withdrawal, because Tameka Rogers ("Charging Party") cannot establish that she was discriminated against based on her race or retaliated against, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). ***In reality, Charging Party voluntarily resigned from employment after months of poor performance and inability to manage her workload.*** No unlawful actions have taken place here. Therefore, Morgan & Morgan respectfully requests that the U.S. Equal Employment Opportunity Commission issue a no reasonable cause determination in connection with the Charge.[1]

---

[1] Please note that this response includes confidential information not to be disclosed without the written approval of Morgan & Morgan. *See* 42 U.S.C. §§ 2000e-5(b); 2000e-8(e); 29 C.F.R. §§ 1601.22, 1601.26; 56 Fed. Reg. 10847. In addition, this response is based upon our understanding of the facts and the information reviewed thus far. Although there has not been an opportunity for formal discovery or a complete formal investigation, this response is submitted for the purpose of aiding the EEOC in its investigation and facilitating the informal resolution of these matters. This response, while believed to be accurate, does not constitute an affidavit or a binding statement of Morgan & Morgan's legal position, nor is it intended to be used as evidence of any kind in any administrative or court proceeding in connection with Charging Party's allegations. Because additional facts likely would be uncovered through discovery or following a full investigation, Morgan & Morgan in no way waives its right to present new or additional information at a later date, for substance or clarification. Moreover, by responding to this Charge, Morgan & Morgan does not waive, and hereby preserves, any and all substantive and procedural defenses that may exist to the Charge and Charging Party's allegations. Morgan & Morgan requests that any efforts to contact its current managers be directed through its counsel.

Investigator Musgrave
December 16, 2024

## I.    MORGAN & MORGAN'S COMMITMENT TO COMPLYING WITH THE LAW

Morgan & Morgan is the largest personal injury law firm in the United States. Morgan & Morgan makes every effort to ensure that it and its employees comply with all local, state, and federal anti-discrimination laws, and does not tolerate discrimination or harassment of any kind based on any protected characteristic. The Firm's Equal Employment Opportunity ("EEO") Statement reads, in relevant part:

> Morgan & Morgan is an equal opportunity employer adhering to all federal, state, and local laws and regulations pertaining to equal opportunity. To this end, employment decisions are based on merit, qualifications and competence. Morgan & Morgan believes in employing the most suitable individual to perform a job. The Company does not discriminate against any individual with regard to **race**, religion, color, national origin, ancestry, age, sex, gender, sexual orientation, disability, pregnancy, genetic information, veteran status, or any other characteristic protected by federal, state, and/or local law.

*(See Exhibit 1, Equal Employment Opportunity Policy.)*

Morgan & Morgan's commitment to complying with the law is further reflected through its Anti-Discrimination and Anti-Harassment and Retaliation Policies, which provide that Morgan & Morgan does not and will not tolerate discrimination or retaliation against any of its employees. *(See Composite Exhibit 2, Anti-Discrimination, Harassment, and Retaliation Policies.)*

Morgan & Morgan encourages employees to report any prohibited conduct in accordance with its complaint procedure. The complaint procedure is set forth in Morgan & Morgan's Reporting Discrimination or Harassment Policy, and states:

Employees are required to report any conduct that may constitute as prohibited discrimination or harassment, as well as sexual harassment or retaliation, even if the discrimination, harassment, sexual harassment or retaliation is caused by a non-employee. Any employee or non-employee who is subject to, witnesses, or becomes aware of potential instances of prohibited discrimination or harassment, including sexual harassment or retaliation, or has been subjected to behavior that may constitute as prohibited discrimination or harassment, including sexual harassment or retaliation, is required to report such behavior to Human Resources. A prompt investigation will be conducted of each and every complaint and appropriate action will be taken. Human Resources has the responsibility for investigating and resolving complaints of harassment. In the event of a complaint involving Human Resources, the Chief People Officer should be notified, and he will fulfill the investigatory role in this process. Employees are required to cooperate in all Company investigations. Complaints will be handled

Investigator Musgrave
December 16, 2024

confidentially, to the extent possible.

If you are subject of, or a witness to, discrimination, harassment, sexual harassment, and/or retaliation, you should report the incident to your supervisor and/or Human Resources. Reports of sexual harassment may be made verbally or in writing. To inform the Company of any type of harassment, discrimination, and/or retaliation, you may reach out directly to the Human Resources department by phone, e-mail, by filling out a complaint form, letter, or any other means in which you feel comfortable; however, it must be reported. A form for submission of a written complaint is attached to this policy, and you are encouraged to use this complaint form. Employees who are reporting sexual harassment on behalf of other employees should use the complaint form and note that it is on another employee's behalf. Any intentionally false accusation or report, such as an accusation or a report made in bad faith, will be treated as a serious violation of Morgan & Morgan policies and may result in discipline, up to termination. Morgan & Morgan encourages every person to report violations, seek consultation, and assist others in complying with this Policy. A complaint that is made in good faith, but which cannot be substantiated, is not a violation of this Policy. Remedial actions for violating this policy may be in the form of disciplinary action, up to, and including, termination from Morgan & Morgan.

(*See Exhibit 3, Reporting Discrimination and/or Harassment Policy.*)

These and other relevant policies are included in Morgan & Morgan's Employee Handbook made available to all employees at the start of and throughout their employment. Charging Party received a copy of these policies when she joined the Firm, and agreed to abide by the policies listed therein. (*See Exhibit 4, Signed Handbook Acknowledgement Form.*)

## II.   CHARGING PARTY'S EMPLOYMENT WITH MORGAN & MORGAN

### A.   Charging Party's Hire and Employment

On October 2, 2023, Morgan & Morgan hired Charging Party as a Case Manager at the Firm's Alpharetta, Georgia location. Charging Party worked on Morgan & Morgan's Personal Injury Pre-Suit Operations team, reporting to Pre-Suit Operations Manager Jeanette Galo; Senior Regional Director of Personal Injury Operations Steve Kim was Charging Party's second-level manager. The Firm assigns each Case Manager to a supervising attorney who ensures that any and all case decisions are made at their direction. Here, the Firm assigned Charging Party to support Attorney Isabella Stanton. As a Case Manager, Charging Party was responsible for assisting Attorney Stanton with preparing case summaries, obtaining documents from insurance carriers and medical providers, and assisting with settlements. Case Managers at Morgan & Morgan, including, formerly, Charging Party, are expected to be team players, have positive interactions with clients, and manage their workloads with positive attitudes and minimal supervision.

Investigator Musgrave
December 16, 2024

### B. Charging Party's Performance Declines After Promotion to Case Manager Lead

During the first six months of her employment, Charging Party generally met the Firm's expectations for her performance, and in April 2024, Morgan & Morgan promoted Charging Party to Case Manager Lead. As Case Manager Lead, Charging Party continued to perform her Case Manager job responsibilities while also supervising a team of five (5) Case Managers. Case Manager Leads play a critical role in ensuring the efficient and effective management of cases, under an attorney's supervision, while fostering a collaborative and supportive team environment. As Case Manager Lead, Charging Party was expected to monitor not only her own cases, but also her team's cases to ensure they were moving forward according to specified case timelines and deadlines. If cases were not moving forward fast enough (for example, new case documents came in but the assigned Case Manager delayed reviewing them), then Charging Party was expected to step in and take proactive measures to clear the outstanding case tasks.

It soon became apparent that Charging Party could not handle the increased demands of her new role. On several occasions after her promotion, Charging Party's performance fell short of Morgan & Morgan's reasonable expectations when, for example, she failed to timely and consistently monitor the Firm's internal case system and track internal case deadlines, new case documents, or related correspondence. To help Charging Party manage and move forward her case load, Ms. Galo repeatedly sent Charging Party reminders and status inquiries. For example:

(1) On June 19, 2024, Ms. Galo sent Charging Party a list of fourteen (14) cases which had not been settled per the supervision and direction of Attorney Stanton, or transferred to Attorney Stanton for possible litigation in the previous six (6) months. Per Firm policy, cases must be "moved" within 180 days of sending a demand, but the fourteen cases in question just sat idle. Charging Party did not acknowledge Ms. Galo's list or otherwise respond to Ms. Galo's inquiry – despite her role requiring communication, and proactive monitoring and movement of cases.

(2) On July 2, 2024, Ms. Galo sent Charging Party another list of eleven (11) cases for which no demand letter had been sent in the past six (6) months. Charging Party did not respond.

(3) Ms. Galo reminded Charging Party that Charging Party needed to ensure that a certain subset of clients scheduled MRIs as part of their ongoing medical treatment. Charging Party's MRI scheduling rate was 70.27%, well below the minimum 80% that the Firm expected. At one point, Charging Party had eleven (11) cases with no MRI scheduled.

(4) Ms. Galo sent Charging Party frequent reminders to review new documents that had been added to the Firm's internal document system. Per Firm policy, Charging Party was required to review the document system daily to monitor new documents the Firm received for each case (for example, responses to demand letters, or insurance policy documents). Charging Party failed to maintain consistent document review protocols,

often accumulating many documents that remained unreviewed for several days. By not timely reviewing new documents, Charging Party could not transfer documents or case inquiries to Attorney Stanton, thereby creating a backlog.

(5) Ms. Galo frequently reviewed Charging Party's settled cases, to ensure they were closed out properly. In some cases, Charging Party marked the cases as settled, despite certain items like Uninsured Motorist coverage remaining pending.

Throughout Charging Party's employment as Case Manager Lead, Ms. Galo constantly encouraged Charging Party to ask questions and reminded Charging Party that she was available as a resource. Instead of utilizing Ms. Galo as a resource or seeking out additional support, Charging Party oftentimes resisted Ms. Galo's reminders and efforts. If Ms. Galo failed to include a "please" or "thank you" in her reminders, Charging Party took it personally and apparently felt that Ms. Galo was being rude. In general, Charging Party seemingly interpreted Ms. Galo's brief reminders as personal critiques of her work ethic – rather than normal work-related communications of expectations and follow-ups from a supervisor. On one occasion, Ms. Galo answered a Case Manager's question about a matter which Charging Party had previously discussed with the Case Manager. Instead of welcoming Ms. Galo's assistance on such a routine inquiry, Charging Party claimed that Ms. Galo should have consulted with her before responding and that Charging Party was therefore embarrassed as the Case Manager Lead. Charging Party was more focused on picking apart her supervisor's actions and statements than on actually doing her job.

## C. Morgan & Morgan Investigates Charging Party's Allegations

In early June 2024, Charging Party contacted Human Resources Director Brian Nason with a rambling diatribe of "concerns" about Ms. Galo. Charging Party complained about: (1) an incident involving another Case Manager and Attorney Stanton in which Charging Party adamantly denied being involved; (2) a conversation in which Ms. Galo informed Charging Party that staffing changes would be made to her team, but allegedly did not know when these changes would take place; and (3) that Charging Party had not received a raise or a personal office as a Case Manager Lead. Notably absent from Charging Party's complaint was any reference of anyone discriminating against or harassing Charging Party. As had become routine by this point, Charing Party's focus was on the office drama – who was talking about her, and saying what, and what other people were doing.

Regarding the raise issue, Ms. Galo repeatedly informed Charging Party that Morgan & Morgan only offers raises at the beginning of each calendar year and Charging Party would receive a raise accordingly, assuming she met the eligibility criteria.[2] Charging Party apparently believed that Ms. Galo had authority to approve a raise – but that was not the case. Regarding an office, as

---

[2] Morgan & Morgan has a similar calendar-year policy regarding bonuses. Occasionally, the Firm will offer incentive bonuses for attorneys and their teams who achieve certain revenue goals for a specifically designated month. While the Firm provided one such incentive bonus during May 2024—which Charging Party received—there were no further incentive bonuses available during Charging Party's employment that could have been "denied" to her.

Charging Party also knew, the Alpharetta office had limited office space and could not accommodate everyone in Charging Party's department with a personal office. Ultimately, after investigating Charging Party's allegations, Mr. Nason spoke separately with Charging Party and Ms. Galo and encouraged both to find ways to communicate better and address their work-related concerns directly.

## D.     Charging Party Voluntarily Resigns from Employment

Despite further efforts from Ms. Galo and Mr. Nason to assist Charging Party, Charging Party failed to consistently manage both her own and her team's caseloads. She regularly made mistakes, for example by entering the wrong insurance liability limits into the case file – mistakes which she then blamed on being overworked or dismissed completely as "false narratives." Instead of communicating directly with Ms. Galo or Attorney Stanton, Charging Party also started to contact Mr. Nason directly to "update" him that, for example, Attorney Stanton was accusing her of poor case management or that Ms. Galo was not helping her develop in her role. She flooded Mr. Nason's inbox with recaps of minor interactions with Attorney Stanton or Ms. Galo, once again focusing on the workplace drama instead of doing her work, for example:

> Good day Brian.
>
> I'm not sure where if Attorney Stanton will say, my response to her was rude in the attached screenshot, because of the exclamation point, but it wasn't. I was given a Quick Response option as I was preparing to respond. It gave 3 options to choose from:
> "Will do!" "
>  I'm on i
> ....and another one.
>
> I chose ; "Will do!" as my response to her.
>
> I wanted you to know just in case she wanted to report it as rude. It was not my attention. I chose the first option given to me. It sounds like excitement to me.
>
> Just wanted you to know.

Mr. Nason continuously encouraged Charging Party to address any minor issues that she had with Attorney Stanton and/or Ms. Galo with them directly, although he, of course, was available to address any work-related concerns that were more appropriate for handling by HR.

In September 2024, Ms. Galo asked Charging Party to meet with her to discuss the ongoing concerns around Charging Party's performance, workload, and leadership. Ms. Galo also wanted to address Charging Patry's actions of spreading rumors around the office about her strained relationship with Ms. Galo, and constant petty comments directed at Ms. Galo outside of Ms. Galo's presence that were now affecting the team. Charging Party met with her team ahead of the meeting to say that she was "being called on the carpet" and instructed her team not to trust Ms. Galo because she and other Firm leaders were supposedly out to "get" her.

Investigator Musgrave
December 16, 2024

During the meeting, Ms. Galo reminded Charging Party that any questions about instructions, tasks, responsibilities, clients, metrics, training, or other work-related issues would better be directed to Ms. Galo or Attorney Stanton, who were better positioned to address these types of inquiries than Mr. Nason in HR. Ms. Galo further reminded Charging Party that Ms. Galo and Attorney Stanton were simply doing their jobs as Charging Party's supervisors, and Charging Party needed to stop causing confusion and dissension with the team or take it personally just because they were monitoring Charging Party's caseload and performance. At no point did Ms. Galo discourage Charging Party from going to Human Resources with any concerns that Human Resources could address. Notably, Charging Party continued to contact Mr. Nason after this meeting – regardless of any purported instructions or discouragement from Ms. Galo – which clearly shows she was not discouraged from contacting Mr. Nason.

In late September and early October 2024, Charging Party continued to make basic mistakes on tasks for which Attorney Stanton and Ms. Galo had already provided instructions several times. On one occasion, Attorney Stanton asked Charging Party about three cases which had been marked settled when they were not. Rather than respond professionally and addressing the inquiry directly with Attorney Stanton, Charging Party again complained to Mr. Nason.

On October 2, 2024, Charging Party voluntarily resigned from employment. Charging Party said she was grateful for the opportunity and skills she had acquired at Morgan & Morgan. Notably, Charging Party said nothing at the time of her resignation about any purported harassment or discrimination at Morgan & Morgan.

## III.    LEGAL ANALYSIS

### A.    Charging Party Cannot Establish a *Prima Facie* Case of Race Discrimination

Charging Party must prove discrimination through direct or circumstantial evidence. *Castillo v. Allegro Resort Mktg.*, 603 F. App'x 913, 916 (11th Cir. 2015). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the [relevant protected] basis . . . constitute direct evidence of discrimination." *Id.* at 917. Here, Charging Party has offered no direct evidence of race discrimination. The alleged statements Charging Party attributes to Ms. Galo—that "[Charging Party] was not like anyone else" or that Ms. Galo did not want an "old white lady on her team" or that "if she does not like someone, she will get rid of them"—are, at most, stray, isolated remarks that are either not directed to Charging Party or are not made by a decision-maker in close temporal proximity to an adverse decision, and do not constitute direct evidence of race discrimination. *See, e.g., Chunxue Wang v. Fla. Atl. Univ. Bd. of Trustees*, No. 16-80915-CIV, 2018 WL 3241359, at *16 (S.D. Fla. Mar. 8, 2018) (stray, isolated remarks made by non-decision-makers and unrelated to the employment decision are not direct evidence of discrimination (citing *Rojas v. Florida*, 285 F.3d 1339, 1342–43 (11th Cir. 2002))).

To establish race discrimination via circumstantial evidence, Charging Party must prove, *inter alia*, that she was subjected to an adverse employment action and similarly situated

Investigator Musgrave
December 16, 2024

employees were treated more favorably than her. *Crisman v. Fla. Atl. Univ. Bd. of Trustees*, 659 F. App'x 572, 578 (11th Cir. 2016). Charging Party cannot prove these prongs of her *prima facie* case. As an initial matter, Charging Party has not identified a single comparator who was treated more favorably with respect to any alleged actions. *See Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019) (holding that plaintiff must assert comparators who are "similarly situated in all material respects"). More importantly, Charging Party was not subjected to any cognizable adverse employment action. Charging Party claims she was denied a bonus, but that is simply not true – at no point during Charging Party's employment was she denied a bonus that was available and for which she qualified. Second, as described above, Ms. Galo had no authority to approve any bonuses for Charging Party.

Even more problematic for Charging Party is her resignation on October 2, 2024. Charging Party's voluntary and deliberate decision to resign from employment does not constitute "a *serious and material* change in the terms, conditions, or privileges of employment" necessary to establish a violation of the law. *Crawford v. Carroll*, 529 F.3d 961, 970–71 (11th Cir. 2008); *Jones v. Allstate Ins. Co.*, 707 F. App'x 641, 646 (11th Cir. 2017) (employee's voluntary and deliberate decision to resign was not adverse action). To the extent Charging Party may claim her resignation is a constructive discharge, Charging Party cannot prove that her work conditions were so intolerable that a reasonable person in her position would have been compelled to resign. *See, e.g.*, *Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 894–95 (11th Cir. 2013) (to establish constructive discharge, plaintiff must show "working conditions were so intolerable that a reasonable person in her position would have been compelled to resign"—a "high threshold" that requires plaintiff to show harassment more severe or pervasive than for a hostile working environment). Taken together, Charging Party's allegations are entirely insufficient to meet the high threshold for constructive discharge.

## B.    Charging Party Cannot Establish a *Prima Facie* Case of Retaliation

Charging Party's retaliation claim fares no better. Title VII prohibits an employer from retaliating against an employee because the employee has opposed an unlawful employment practice under Title VII (the opposition clause) or because the employee made a charge, testified, assisted, or participated in an investigation, proceeding, or hearing under Title VII (the participation clause). *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000) (citing 42 U.S.C. § 2000e-3(a)). To prove retaliation, Charging Party must show she: (1) engaged in protected expression, (2) suffered a materially adverse action, and (3) there is a causal link between the protected expression and the adverse action. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

Charging Party's retaliation claim fails because she cannot establish that she participated in activity protected by Title VII. To receive the protections of Title VII's anti-retaliation provision, an employee must complain about something that is prohibited under Title VII. Here, Charging Party's complaints were about some workplace gripes and had nothing to do with Title VII.

Investigator Musgrave
December 16, 2024

Even assuming that Charging Party's complaint(s) to Mr. Nason are protected (which they are not), Charging Party's retaliation claim fails for lack of an adverse employment action. As described above, she resigned her employment. She cannot establish that her working conditions were so intolerable as to constitute a constructive discharge, and thus she cannot establish that she experienced a retaliatory adverse action. *See Beltrami v. Special Counsel, Inc.*, 170 F. App'x 61, 61 (11th Cir. 2006).

## C.   Charging Party Cannot Prove a Claim for Hostile Work Environment

Charging Party cannot establish the high bar for a hostile work environment claim. A hostile work environment claim requires that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To establish a retaliatory hostile work environment claim, an employee must show that: (1) she engaged in protected activity; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her protected activity; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable. *See id.*

As the federal anti-discrimination employment statutes are not a general civility code, not all workplace conduct that an employee may call "harassment" amounts to a cognizable hostile work environment claim. *See Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999). Thus, "an employer's harassing actions toward an employee do not constitute employment discrimination . . . unless the conduct is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). Courts have repeatedly held that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998) (internal citation omitted).

Requiring that the conduct be so severe or pervasive as to alter the terms and conditions of employment is the decisive element and "is the element that tests the mettle of most [] harassment claims." *See Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (stating that the severe or pervasive requirement is "crucial" and "ensure[s] that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment'"). "'It is not enough that a supervisor or coworker fails to treat a[n] [] employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America . . . to be classified as discriminatory.'" *Cote v. Shinseki*, No. 8:07-cv-1524-T-TBM, 2009 WL 1537901, at \*13 (M.D. Fla. June 2, 2009) (quoting *Minor v. Ivy Tech State Coll.*, 174 F.3d 855, 858 (7th Cir. 1999)).

"The level of severity or pervasiveness necessary to establish a [] hostile environment is high." *Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1150 (N.D. Ga. 2007). To meet the sufficiently severe and pervasive standard, the conduct must involve "patterns or allegations of extensive, long lasting, unredressed, and uninhibited [] threats or conduct." *See Gupta,* 212 F.3d at 586. The Eleventh Circuit has established four factors to be used to determine if the comments and behavior are significant enough to objectively alter the terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

In her Charge, Charging Party claims in a conclusory fashion that Ms. Galo subjected her to a hostile work environment. Charging Party's allegations come nowhere close to satisfying the high bar for a hostile work environment. Other than one vague allegation that two unidentified African American employees told Charging Party that Ms. Galo was racist, Charging Party has no evidence that would demonstrate any hostile work environment at Morgan & Morgan based on her race. Charging Party's allegations come nowhere close to the "severe and pervasive" threshold necessary to establish a claim for a hostile work environment. In *Helm v. J.H. Gatewood Emergency Servs., P.A.*, No. 8:11-cv-572-EAK-AEP, 2012 U.S. Dist. LEXIS 94805 (M.D. Fla. July 9, 2012), the Eleventh Circuit said that "[t]he cases that demonstrate the pervasiveness feature employees who were harassed "*at least once a day, every day*." (citing *Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862 (11th Cir. 2009) (alleged conduct was not sufficiently severe or pervasive where an employee experienced harassment *daily* for four months)). Charging Party has further made no allegations of any "daily" harassment, and so her claim fails as a matter of law.

To the extent that Charging Party is claiming a retaliatory hostile work environment, again, her allegations are baseless. Charging Party alleges that after her alleged reporting of "harassment"—which did not occur, as described above—Ms. Galo began complaining about her work. What Charging Party attributes as "complaining" about her work was simply Ms. Galo sending normal work-related reminders and communicating the expectations of her role. Any subjective perception that Ms. Galo was targeting her is simply a continuation of Charging Party's own fixation on drama. Receiving feedback and instructions about her role is not retaliatory; rather, such acts are "are neutral on their face and are not materially adverse employment actions as contemplated by Title VII." *See Tonkyro v. Sec'y, Dep't of Veteran Affairs*, No. 8:16-cv-2419-CEH-AEP, 2024 WL 2846356, at \*12 (M.D. Fla. June 5, 2024). What Charging Party claims she perceived as a retaliatory hostile work environment actually amounts to "nothing more than ordinary tribulations of the workplace and normal[] petty slights [and] minor annoyances . . . which are not actionable under Title VII. *See id.* at \*14. For these reasons, Charging Party's hostile work environment claim fails as a matter of law.

Investigator Musgrave
December 16, 2024

## IV.   CONCLUSION

Based on the facts and the law, this Charge should be dismissed, absent withdrawal, without further expense to our client, because Charging Party cannot establish that Morgan & Morgan discriminated or retaliated against her, or subjected her to any alleged hostile work environment, in violation of any law.

Sincerely,

**FORDHARRISON LLP**

*/s/ Luis A. Santos*
LUIS A. SANTOS
VIKTORYIA JOHNSON

# Charging Party's Rebuttal Statement to Section B, point (3, 4 & 5)

**Morgan and Morgan stated in their Position Statement: On July 2, 2024, Ms. Galo sent Charging Party another list of eleven (11) cases for which no demand letter had been sent in the past six (6) months. Charging Party did not respond.)**

Morgan & Morgan is claiming that on July 2, 2024, 11 cases had no demand letter and had not been sent to the adjuster. We all were given cases that were with the firm prior to my hire date which was October 2, 2023. Some of those cases were almost reaching SOL (statute of limitation) with the firm due to poor case management, staffing issues with prior attorneys and case managers. This claim against me is false. 6 months prior to July 2 , 2024, would have potentially placed those cases in January, 3 months before my promotion.  Which means the cases were with the firm prior to my hire date. This statement from Morgan & Morgan proves they are scrambling for false information against me, to dismiss my charge against them. From the time I was employed with the firm, I was under 4 different Attorneys, which is also 4 different legal teams. The cases were constantly moved in and out of teams with multiple Case Managers who had worked on the cases. Their entire case management flow was poor and unorganized and demonstrated negligence because both attorneys and prior case managers failed their clients tremendously. This statement should be dismissed. This is inaccurate and false information. Morgan & Morgan cannot support this statement with facts.

In Morgan & Morgans Position stated, they stated in point (3): **Ms. Galo reminded Charging Party that Charging Party needed to ensure that a certain subset of clients scheduled MRIs as part of their ongoing medical treatment. Charging Party's MRI scheduling rate was 70.27%, well below the minimum 80% that the Firm expected. At one point, Charging Party had eleven (11) cases with no MRI scheduled.**

**My response:**

This statement is false and unwarranted. As a Case Manager, it is not legal to pressure a client to receive an MRI. We are not medical providers. That is determined by the client and

their physician. Our job as a Case Manager was to simply "ask the client" if they received an MRI. If yes, we document it, if no we left the are blank. The firm often pressured us with this because they were more focused on increasing the value of the case so they could sue the insurance company for more money. Many clients did not want to receive an MRI, as they have a right not to. Some providers felt they did not need an MRI, and they are the experts. It's their patient's health. If my MRI percentage failed on the firms targeted progress reports, it was not because I failed as a Case Manager Lead, it's because the doctor did not order an MRI for the client and/or the client refused to get an MRI. This statement should be dismissed as it suggests that I was responsible for scheduling an MRI for a client when I am not a medical provider.

In (4) of Morgan & Morgan position stated, it states: **Ms. Galo sent Charging Party frequent reminders to review new documents that had been added to the Firm's internal document system. Per Firm policy, Charging Party was required to review the document system daily to monitor new documents the Firm received for each case (for example, responses to demand letters, or insurance policy documents). Charging Party failed to maintain consistent document review protocols often accumulating many documents that remained unreviewed for several days. By not timely reviewing new documents, Charging Party could not transfer documents or case inquiries to Attorney Stanton, thereby creating a backlog.**

#### My Response:

As a Case Manager Lead, I had no issues with adding, reading and understanding all new documents added to the system. I keep a great record of insurance info, demand responses for all of my cases. Each month the firm would give a bonus to all who met case progress requirements and who assisted with settling cases and processing demands. Bonuses were also given to Case Managers for meeting certain metrics performance levels and progress percentage for all cases we worked; and for those Case Managers and Case Managers Leads who met and/or exceeded the firm's expectations. If such performance was true, the firm never gave a written or verbal warning concerning my performance to back their statement.

Each month, June 2024-October 2024, I received a bonus for my performances because I met the firms. This can be proved by reviewing all check stubs I received each pay period which included my paid bonuses from the firm. This statement should be dismissed.

Morgan & Morgan has no written proof that I failed to maintain consistent document reviews. This statement proves the firm is scrambling for information against my claim of retaliation and making false statements on their position statement to the EEEOC against the charging party. I have enclosed a copy of my last 4 check stubs with the firm to prove the bonuses I received because I exceed my performance and settled cases with the firm. (See Exhibit Check Stubs last 4 Check Stubs) on next page)

This proves that Morgan & Morgan is making and reporting false claims in their position statement against the charging party.

**MORGAN & MORGAN**

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

| Pay Statement | |
|---|---|
| Period Start Date | 09/29/2024 |
| Period End Date | 10/12/2024 |
| Pay Date | 10/18/2024 |
| Document | 137285900 |
| **Net Pay** | **$1,881.27** |

### Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

### Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $1,650.00 | $9,700.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $1,206.40 |
| PTO Payout | 29.480000 | $622.03 | $622.03 |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | $21,966.18 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours  45.480000

### Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K EE Pretax | $2,609.63 | Yes | $78.29 | $238.80 | $0.00 | $0.00 |
| AD&D | $2.08 | No | $2.08 | $43.68 | $0.00 | $0.00 |
| Child AD&D | $0.06 | No | $0.06 | $1.98 | $0.00 | $0.00 |
| Child Life | $0.42 | No | $0.42 | $13.32 | $0.00 | $0.00 |
| Dental | $50.82 | Yes | $50.82 | $1,101.24 | $0.00 | $0.00 |
| EE Sup Life | $8.35 | No | $8.35 | $175.35 | $0.00 | $0.00 |
| Medical | $51.36 | Yes | $51.36 | $1,057.14 | $143.05 | $3,082.80 |
| Vision | $9.26 | Yes | $9.26 | $210.21 | $0.00 | $0.00 |

### Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $2,419.90 | $336.61 | $2,767.89 |
| Employee Medicare | $2,498.19 | $36.22 | $550.54 |
| Social Security Employee Tax | $2,498.19 | $154.89 | $2,354.05 |

### Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 0.0000 | 29.8000 |

### Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $1,881.27 |
| Total | | $1,881.27 |

### Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $2,609.63 | $2,419.90 | $527.72 | $200.64 | $1,881.27 |
| YTD | $40,337.07 | $37,729.68 | $5,672.48 | $2,841.72 | $31,822.87 |

## MORGAN & MORGAN

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

**Pay Statement**

| | |
|---|---|
| Period Start Date | 09/29/2024 |
| Period End Date | 10/12/2024 |
| Pay Date | 10/18/2024 |
| Document | 137286198 |
| **Net Pay** | **$3,842.56** |

### Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

### Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $5,650.00 | $15,350.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $1,206.40 |
| PTO Payout | 0.000000 | $0.00 | $622.03 |
| Regular-Salary | 0.000000 | $0.00 | $21,966.18 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours  0.000000

### Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K EE Pretax | $5,650.00 | Yes | $169.50 | $408.30 | $0.00 | $0.00 |
| AD&D | $0.00 | No | $0.00 | $43.68 | $0.00 | $0.00 |
| Child AD&D | $0.00 | No | $0.00 | $1.98 | $0.00 | $0.00 |
| Child Life | $0.00 | No | $0.00 | $13.32 | $0.00 | $0.00 |
| Dental | $0.00 | Yes | $0.00 | $1,101.24 | $0.00 | $0.00 |
| EE Sup Life | $0.00 | No | $0.00 | $175.35 | $0.00 | $0.00 |
| Medical | $0.00 | Yes | $0.00 | $1,057.14 | $0.00 | $3,082.80 |
| Vision | $0.00 | Yes | $0.00 | $210.21 | $0.00 | $0.00 |

### Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $5,480.50 | $1,205.71 | $3,973.60 |
| Employee Medicare | $5,650.00 | $81.93 | $632.47 |
| Social Security Employee Tax | $5,650.00 | $350.30 | $2,704.35 |

### Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 0.0000 | 29.8000 |

### Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $3,842.56 |
| Total | | $3,842.56 |

### Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $5,650.00 | $5,480.50 | $1,637.94 | $169.50 | $3,842.56 |
| YTD | $45,987.07 | $43,210.18 | $7,310.42 | $3,011.22 | $35,665.43 |

## MORGAN & MORGAN

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1604

**Pay Statement**

| | |
|---|---|
| Period Start Date | 09/15/2024 |
| Period End Date | 09/28/2024 |
| Pay Date | 10/04/2024 |
| Document | 135761181 |
| **Net Pay** | **$3,806.77** |

### Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

### Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $4,000.00 | $8,050.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 8.000000 | $168.80 | |
| Paid Time Off | 8.000000 | $168.80 | |
| Paid Time Off | 8.000000 | $168.80 | $1,206.40 |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | $21,628.58 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours 64.000000

### Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K EE Pretax | $5,350.40 | Yes | $160.51 | $160.51 | $0.00 | $0.00 |
| AD&D | $2.08 | No | $2.08 | $41.60 | $0.00 | $0.00 |
| Child AD&D | $0.06 | No | $0.06 | $1.92 | $0.00 | $0.00 |
| Child Life | $0.42 | No | $0.42 | $12.90 | $0.00 | $0.00 |
| Dental | $50.82 | Yes | $50.82 | $1,050.42 | $0.00 | $0.00 |
| EE Sup Life | $8.35 | No | $8.35 | $167.00 | $0.00 | $0.00 |
| Medical | $51.36 | Yes | $51.36 | $1,005.78 | $143.05 | $2,939.75 |
| Vision | $9.26 | Yes | $9.26 | $200.95 | $0.00 | $0.00 |

### Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $5,078.45 | $859.98 | $2,431.28 |
| Employee Medicare | $5,238.96 | $75.97 | $514.32 |
| Social Security Employee Tax | $5,238.96 | $324.82 | $2,199.16 |

### Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 4.0000 | 29.8000 |

### Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $3,806.77 |
| Total | | $3,806.77 |

### Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $5,350.40 | $5,078.45 | $1,260.77 | $282.86 | **$3,806.77** |
| YTD | $37,727.44 | $35,309.78 | $5,144.76 | $2,641.08 | $29,941.60 |

## MORGAN & MORGAN

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

**Pay Statement**

| | |
|---|---|
| Period Start Date | 09/01/2024 |
| Period End Date | 09/14/2024 |
| Pay Date | 09/24/2024 |
| Document | 134317321 |
| **Net Pay** | **$527.63** |

### Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

### Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $750.00 | $4,050.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $700.00 |
| Regular-Salary | 0.000000 | $0.00 | $20,784.58 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours  0.000000

### Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| AD&D | $0.00 | No | $0.00 | $39.52 | $0.00 | $0.00 |
| Child AD&D | $0.00 | No | $0.00 | $1.86 | $0.00 | $0.00 |
| Child Life | $0.00 | No | $0.00 | $12.48 | $0.00 | $0.00 |
| Dental | $0.00 | Yes | $0.00 | $999.60 | $0.00 | $0.00 |
| EE Sup Life | $0.00 | No | $0.00 | $158.65 | $0.00 | $0.00 |
| Medical | $0.00 | Yes | $0.00 | $954.42 | $0.00 | $2,796.70 |
| Vision | $0.00 | Yes | $0.00 | $191.69 | $0.00 | $0.00 |

### Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $750.00 | $165.00 | $1,571.30 |
| Employee Medicare | $750.00 | $10.87 | $438.35 |
| Social Security Employee Tax | $750.00 | $46.50 | $1,874.34 |

### Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 4.0000 | 49.8000 |

### Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $527.63 |
| Total | | $527.63 |

### Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $750.00 | $750.00 | $222.37 | $0.00 | **$527.63** |
| YTD | $32,377.04 | $30,231.33 | $3,883.99 | $2,358.22 | $26,134.83 |

**MORGAN & MORGAN**

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

| Pay Statement | |
|---|---|
| Period Start Date | 09/01/2024 |
| Period End Date | 09/14/2024 |
| Pay Date | 09/20/2024 |
| Document | 133783067 |
| **Net Pay** | **$1,388.90** |

## Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | | | |
|---|---|---|---|
| Employee Number | 1008492 | Pay Group | MM Atlanta Mngmt. Inc BW |
| SSN | XXX-XX-XXXX | Location | Alpharetta - AGN |
| Job | Case Manager | Legal Entity | ATLANT - Atlanta |
| Pay Rate | $21.1000 | Division | LGSVS - Legal Services |
| Pay Frequency | Biweekly | Department | PITPL - PI - Pre-Suit |
| | | Sub Dept | CS - Case Staff |

## Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | 0.000000 | $0.00 | $3,300.00 |
| Holiday | 8.000000 | $168.80 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $700.00 |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | $20,784.58 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours 80.000000

## Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| AD&D | $2.08 | No | $2.08 | $39.52 | $0.00 | $0.00 |
| Child AD&D | $0.06 | No | $0.06 | $1.86 | $0.00 | $0.00 |
| Child Life | $0.42 | No | $0.42 | $12.48 | $0.00 | $0.00 |
| Dental | $50.82 | Yes | $50.82 | $999.60 | $0.00 | $0.00 |
| EE Sup Life | $8.35 | No | $8.35 | $158.65 | $0.00 | $0.00 |
| Medical | $51.36 | Yes | $51.36 | $954.42 | $143.05 | $2,796.70 |
| Vision | $9.26 | Yes | $9.26 | $191.69 | $0.00 | $0.00 |

## Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $1,576.56 | $56.15 | $1,406.30 |
| Employee Medicare | $1,576.56 | $22.86 | $427.48 |
| Social Security Employee Tax | $1,576.56 | $97.74 | $1,827.84 |

## Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 4.0000 | 49.8000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $1,388.90 |
| Total | | $1,388.90 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $1,588.00 | $1,576.56 | $176.75 | $122.35 | $1,388.90 |
| YTD | $31,627.04 | $29,481.33 | $3,661.62 | $2,358.22 | $25,607.20 |

# Charging Party's Rebuttal Statement to Section B, point (3 , 4 & 5)

Continued....

**5**) In Morgan & Morgans position statement, (5) it states**:**

**Ms. Galo frequently reviewed Charging Party's settled cases, to ensure they were closed out properly. In some cases, Charging Party marked the cases as settled, despite certain items like Uninsured Motorist coverage remaining pending. Throughout Charging Party's employment as Case Manager Lead, Ms. Galo constantly encouraged Charging Party to ask questions and reminded Charging Party that she was available as a resource. Instead of utilizing Ms. Galo as a resource or seeking out additional support, Charging Party oftentimes resisted Ms. Galo's reminders and efforts. If Ms. Galo failed to include a "please" or "thank you" in her reminders, Charging Party took it personally and apparently felt that Ms. Galo was being rude. In general, Charging Party seemingly interpreted Ms. Galo's brief reminders as personal critiques of her work ethic – rather than normal work-related communications of expectations and follow-ups from a supervisor. On one occasion, Ms. Galo answered a Case Manager's question about a matter which Charging Party had previously discussed with the Case Manager. Instead of welcoming Ms. Galo's assistance on such a routine inquiry, Charging Party claimed that Ms. Galo should have consulted with her before responding and that Charging Party was therefore embarrassed as the Case Manager Lead. Charging Party was more focused on picking apart her supervisor's actions and statements than on actually doing her job.**

My Response to (5)

Their statement against my claims is that they reviewed settled cases there were marked incorrectly. My cases were marked according to their status, which often changed if the Attorney wanted to add or request additional information. I marked many cases as instructed by Attorney Isabella Stanton on may occasions and once I marked them, she would create an email with upper management included, with me, and blast me for doing what she asked me to do-- as if I did it on my own terms, in her attempt to create a false

narrative that I am marking cases incorrectly.  She would purposely ask me to mark it, knowing on her end it was incorrect and then blame me for marking it incorrectly. This is the type of unlawful retaliation and harassment I received weekly from Isabella Stanton and Jeanette Galo.

(See emails exhibits on the next pages proving my statement and her false claims as evidence in your investigation)

# Charging Party's Rebuttal Statement to Section C & D : Morgan & Morgan Investigates Charging Party's Allegations

My Response to section C is the Summary of Concerns submitted in my Rebuttal Statement submitted to HR. I reported the following concerns to HR.

1. The firm hired 6 additional Case Manages. Ms Galo walked me over to meet all 6 new Case Manager and after I met them, she told me we would spit the 6 new workers. One of the workers names was Ms. Melanie Waters. She was a white woman around the age of 55-60 years old. Jeanette Galo , who is Hispanic Muslim, told me, she did not want an old white woman on her team and asked if I didn't mind having her on my team. I told her, I had no problem with it. She went on to say, " I wonder how she is going to act working under two minority women, one black (referring to me) and the other Hispanic (referring to her) Ms. Galo show racial discrimination against Ms Melanie Water because she was a older white woman, which is unlawfully in the workplace.

2. I also reported how Jeanette Galo stated her and Steve Kim was approached with a Sexual Harassment complaint from two female Case Managers, Sofia and Karla P. , but refused to report it to HR and decided to cover it up, because they didn't want to deal with it.  Instead, Ms. Galo wanted make mockery of the situations and asked if I wanted to see the accusing parties naked photos that were sent to her. I refused to review the photos.

3. Two other black Case Managers came to me stating Ms. Galo is racist. One, by the name of Theresa A. stated Ms Galo made racial reports about their  hair that made them feel uncomfortable. I reported this to Brian Nason, HR Director.

4. I reported to HR the concerns my team and myself they were having with Ms. Galo, for example, she delete me and my team from a Resource Chat for the Boston Market which prevent us from training material, changes and information we needed to know about cases and settlement.

See the following email complaint in the next page as evidence to back my statement.

# Charging Party's Rebuttal Statement to Section D : Charging Party Voluntarily Resigns from Employment

Mr. Brian Nason, failed to provide a resolution to my concerns, instead, he asked for us to work things out as if were friends that needed reconciliation. My complaints were all true. Ms Galo also referred my emails as "love letters" to Mr. Brian Nason as she told me that each time, I send him an email he forwards it to her and Steve Kim which they mock instead of taking my concerns seriously. A few days before I resigned, Ms. Galo told me that sending emails to Brian Nason, HR Director was a waste of time. She stated this to me: "You think he's going to help you because you are black and he is black, right?" I have an audio recording of he is saying this to me.

She also threatens me with Georgia's At Will law and bullied me with these words, "What I say to you in this office stays in my office! Morgan & Morgan is not worrying about your concerns with me, all they want to do is make money not deal with your concerns".

About two weeks before I resigned, the environment became more difficult to work in as each day Jeanette Galo and Isabella Stanton would harass me in emails, asking me to do tasks that has already been completed and/or tasks they knew I was working on. Daily this happened.

When one her Jeanette Galo's specific teams Case Manager, Shawae,, approached me stating, Irene Lopez told her, that Jeanette is asking Case Manager to lie to Steve Kim and Brian Nason saying, I was not fit to be a Case Manager lead because I am failing to do my job. Ms Shawae, who remains in contact with me to this date, stated that Irene and a few other Case Managers

told Jeanette: "I will not lie on Ms Tameka for you". She is willing to provide a certified statement on this.

On October 2, 2023, I submitted a two-week resignation letter to Morgan and Morgan stating the following:

I am grateful for the skills I have gained working at this firm, but due to the unresolved matters I have reported and the circumstances I am enduring, I am resigning from my position as Case Manager Lead with the firm.

After I submitted my resignation, under a constructive discharge, Brian Nason asked me to call him, and he asked if I could consider not waiting two weeks resign and that it would be ok to let that day, (October 2, 2023) be my last day. He emailed me 4 weeks paystubs as I requested, and a voluntary separation notice a few days later.

Charging Party's Rebuttal to:

LEGAL ANALYSIS A. Charging Party Cannot Establish a Prima Facie Case of Race Discrimination

A. Charging Party Cannot Establish a Prima Facie Case of Race Discrimination Charging Party must prove discrimination through direct or circumstantial evidence. Castillo v. Allegro Resort Mktg., 603 F. App'x 913, 916 (11th Cir. 2015). "Only the most blatant remarks, whose intent could be nothing other than to discriminate on the [relevant protected] basis . . . constitute direct evidence of discrimination." Id. at 917. Here, Charging Party has offered no direct evidence of race discrimination. The alleged statements Charging Party attributes to Ms. Galo—that "[Charging Party] was not like anyone else" or that Ms. Galo did not want an "old white lady on her team" or that "if she does not like someone, she will get rid of them"—are, at most, stray, isolated remarks that are either not directed to Charging Party or are not made by a decision-maker in close temporal proximity to an adverse decision, and do not constitute direct evidence of race discrimination. See, e.g., Chunxue Wang v. Fla. Atl. Univ. Bd. of Trustees, No. 16-80915-CIV, 2018 WL 3241359, at *16 (S.D. Fla. Mar. 8, 2018) (stray, isolated remarks made by non-decision-makers and unrelated to the employment decision are not direct evidence of discrimination (citing Rojas v. Florida, 285 F.3d 1339, 1342–43 (11th Cir. 2002)))

Brian-

I don't know where to start....

But I was told to email you in spite of being told not to email you, to cover myself.

I had a meeting with Jeanette today and I must say—I wish I could have recorded the meeting. She met with each person on my team as well.

She boldly tole me, It would not do me any good to send another email to you, that she called "love letters"

In this email, I will outline things she said until we speak.

--She told me that people on my team told her I said "not to talk to Jeanette. This is not true. I would never do that.
-She told me not to talk to anyone on my team and not to trust them because they all come to her telling her what I am saying.

**Note: This bothered me so, I had to ask 2 of the CM that she meet with today, if they have ever heard me say to them not to talk to Jeanette. They both said no.
They went on to say that the meeting with her was strange and it felt like she was asking them questions to cover herself and or to see if she could find something "negative' to report against me. Both CMs stated this. One also stated, they think she was recording them and it all felt uncomfortable and she was asking them questions like;**
**"why do you go to Tameka for questions and not me"---One CM stated, "because she acts like she wants to help us, when she doesn't'"**
**You can speak with Myles and Claudene to get their statements on the meeting.**

-She brought up the issue with me reporting her to HR stating, reporting to you will not get me anywhere, it's only going to make it worse

she also said she didn't care if I report what she is saying to you, because you will send it to Steve and Steve will send it to her. And there were a few emails I sent you—that you shared with her. She then declared it's not getting me anywhere and what I want to happen to her is not going to happen. (she has Dillon, Steve and Evan)

-She wants to completely stop reporting to you.

**Note: at that moment, I thought and even said, I will stop reporting to you. Maybe it's useless. But I had a conversation with someone who is helping me to navigate through this situation at work and they stated, I needed to let HR know immediately. So this is why I am sending this to you.**

-She said, I am only making myself look bad to everyone and even those on my team when I report to you. She asked me "why of all people do you tell Brian Nason, he is not going to do anything for you"---

-She keep saying, stop the gossiping, on my team, but you can ask them if I gossip. It was if, she was trying to get me to agree with her.

-She asked , "Do you think Brian is going to help you because he is African American and like you?" You keep sending love letters to him complaining about me

-She went on to say, " Imagine, having someone on your team and then they snitch on you, no loyalty, and someone you trusted. (referring to me)

**My response to this statement was and it remains today: "I was not expecting alot of things I saw and heard you say, especially concerning not wanting an older white woman on your team and then have two other black CMs come to me stating you're racist and you  have made statements about their hair. So I did what I thought was right.**
**I also stated, I can understand if she felt betrayed by me—but I was in a place I had never experienced before in a workplace.**

I don't know if that meeting was a set up and to inject fear in me for reporting to you, and after the meeting I said to myself I was going to stop emailing you because maybe, it 's not going to help the issue, but to cover myself, I decided to email you because at this point, I don't know what to do.

Until we speak, she mentioned race, working for the white man, to—nobody cares about what goes on in this firm they just want us to make money.

I can share the rest when we speak. I will type the rest of this statement up tonight when I get home. Again, to cover myself, I felt the need to report this. This is alot.

Let me know if you'd like to talk. I will finish this email tonight. I want to work with everyone. I want to do my job, so please give any private advise you can give me to help me understand what is going on.

**Tameka Rogers**
**Case Manager**

**T:** (770) 299-7705
**F:** (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



<u>$20B+ Recovered</u> • <u>1,000+ Attorneys</u> • <u>120+ Offices</u>

A referral is the best compliment. If you know anyone that needs our help, please have them call our
office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is
addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is
prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original
message. Thank you.

My Response:

I have provided supporting evidence to support my charge of retaliation of discrimination when Morgan and Morgan only provided rambling statements when I have proven through saved emails, that their position was submitted with false information under oath and are not true. I , Tameka Rogers, the charging party have audio recordings to support more rebuttal and to further prove their position statements are submitted with false information. More evidence is available.

CONCLUSION Based on the facts and the law, and the evidence that I have provided,  this Charge should be considered and Morgan and Morgan should be charged with retaliation, racial discrimination, hostile work environment because the Charging Party has  establish with evidence that Morgan & Morgan discriminated or retaliated against her, or subjected her to any alleged hostile work environment, in violation of any law

Hi Brian,

I will continue to report information that I feel is revenant until a resolution is established.

A CM from Jeanette's team approached me today stating these words; ( I can share her name later, she wouldn't mind)

Jeanette is trying to form a few people against you to say you are not a good CML. She mentioned two CMs, Irene and Sofia.
She states Irene told her that she and Sofia was called into Jeanette's office where Jeanette then asked them "if someone were to question you about Tameka-are you willing to say she is not good for this team"

Irene rejected the offer and stated Tameka has not done anything to me and I refuse to be a part of this. AND stating that Irene knows what 'they' are trying to do to me.

However, Sofia (which I am not surprised at) agreed to say it when Jeanette asked her if she was willing.

Also, it was indicated that Ms. Galo has made a promise to make Sofia a CML if she goes along with her and that Sofia and Isabella are both going to testify against my performance because Jeanette is coercing them to do so. Isn't this illegal?

Sofia's word certainly can't be taken seriously if you could read the text message, she has sent me concerning Jeanett's behavior. One stated: "I don't know why "they" (Jeanette and Isabella is coming after you—you have done nothing wrong" . She even mentioned the "phrase" me being fired at will ; she got that from Jeanette.

I have tons of info I can share concerning Sofia.


Just thought you needed to know this.

**Tameka Rogers**
**Case Manager**

**T:** (770) 299-7705
**F:** (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



$20B+ Recovered • 1,000+ Attorneys • 120+ Offices

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

## 1.5   EQUAL EMPLOYMENT OPPORTUNITY

Morgan & Morgan is an equal opportunity employer adhering to all federal, state, and local laws and regulations pertaining to equal opportunity. To this end, employment decisions are based on merit, qualifications and competence. Morgan & Morgan believes in employing the most suitable individual to perform a job. The Company does not discriminate against any individual with regard to race, religion, color, national origin, ancestry, age, sex, gende, sexual orientation, disability, pregnancy, genetic information, veteran status, or any other characteristic protected by federal, state, and/or local law.

This guideline governs all aspects of empoyment, including promotion, assignment, dischrge, and other terms and conditions of employment, as well as the use of all Company facilities.

Consistent with its commitment to equal employment, the Company will work to accommoate disabled employees in keeping with applicable law. If an employee believes he or she needs an accommodation because of a disability, he should make a request to Human Resources and the Company wil engage in an interactive dialogue with the employee to determine the best course of action.

Any employees with questions or concerns regarding any type of discrimination or harssment in the workplace are required to bring these issue to the attention of a supervisor, manager or the Human Resources Department. Employees may raise concerns and make reports without fear of reprisal. If an incident occurs, the employee is required to report immeiately any such matters to the local office Human Resources Manager. If the local Human Resources Manager is not available, Morgan & Morgan offers an employee relations and conflict resolution policy and you should feel comfortable, and must report, any offensive conduct to any member of management so that the issue may be addressed immediately.

No form of unlawful discrimination, including unlawful harassment, will be tolerated.

**EXHIBIT**

**2**

## 2.10 **ANTI-DISCRIMINATION**

Discrimination on the basis of race, religion, color, marital status, national origin, ancestry, age, sex, gender, sexual orientation, disability, pregnancy, genetic information, veteran status, or any other characteristic protected by federal, state, and/or local law is strictly prohibited. Anyone who is found, after appropriate investigation, to have engaged in prohibitd discrimination toward another individual on hese bases will be subject to appropriate disciplinary action up to and including termination of employment or termination of the individual's business relationship with Morgan & Morgan.

Morgan & Morgan employees are not expected to tolerate any discriminatory conduct. Should you encounter any such prohibited conduct, or should you have knowledge of such prohibited conduct happening to another individual, you must report it in accordane with the reporting procedures described below in Section 2.1 (Harassment & Sexual Harassment), so that Morgan & Morgan may take appropriate corrective action.

## 2.11 **HARASSMENT & SEXUAL HARASSMENT**

Harassment on the basis of race, religion, color, marital status, national origin, ancestry, age, sex, gender, sexual orientation, disability, pregnancy, genetic information, veteran status, or any other characteristic protected by federal, state, and/or local law is strictly prohibited. Anyone who is found, after appropriate investigation, to have engaged in prohibited harassment of another employee, applicant for employment, client, office guest, patient, vendor, contractor, subcontractor, paid/unpaid intern, and/or anyone conducting business with Morgan & Morgan will be subject to appropriate disciplinary action, up to and including termination. Employees must avoid any actions or words, including but not limited to jokes, cartoons, and anecdotes, which would constitute prohibited harassment.

#### **Examples of Harassment:**

Case 1:25-cv-05435-JPB-JHR   Document 3   Filed 09/29/25   Page 68 of 97

Behavior which could be construed as harassment includes, but is not limited to, the following:

- degrading any group or class of people;
- assigning less desirable work or working conditions to members of such protected groups baed solely on their group membership; or,
- treating protected individuals in a demeaning fashion.

## Retaliation

Morgan & Morgan will not tolerate retaliation against an individual who, in good-faith, rports a violation or perceived violation of these policies on discrimination and harassment, including sexual harassment, or who is involved in the investigation of any violation of these policies. The complainant and the individuals participating in any investigation are assured of absolute protection from any retaliation. Anyone who engages in retaliation against an individual who has in good faith reported a violation of the laws and/or Morgan & Morgan policies, whether one agrees with the facts reported, or who has engaged in retaliation against an individual participating in any investigation, is subject to discipline, up to and incluing termination.

Unlawful retaliation can be any action that would keep an individual from coming forward to make or support a claim of discrimination or harassment, inluding sexual harassment.

Morgan & Morgan employees are not expectedto tolerate retaliatory conduct. Employees ho are subjected to or who encounter any such prohibited conduct, or who have knowledge of such prohibited conduct happening to another individual, are encouraged to report it through the same channels the initial conduct was reported and in accordance with the reporting procedures set forth in this Policy.

**EXHIBIT**

**3**

## Reporting Discrimination or Harassmen

Employees are required to report any conduct that may constitute as prohibited discrimination or harassment, as well as sexual harassment or retaliaion, even if the discrimination, harassment, sexual harassment or retaliation is caused by a non-employee. Ay employee or non-employee who is subject t, witnesses, or becomes aware of potential instances of prohibited discrimination or harassment, including sexual harassment or retaliation, or has been subjected to ehavior that may constitute as prohibited discrimination or harassment, including sexual harassment or retaliation, is required to report such behavior to Human Resources. A prompt investigation will be conducted of each and every complaint and appropriate action will be taken. Human Resources has the responsibility for investigating and resolving complaints of harassment. In the event of a complaint inolving Human Resources, the Chief People Officer should be notified, and he will fulfill the investigatory role in this process. Employees are required to cooperate in all

Case 1:25-cv-05435-JPB-JHR   Document 3   Filed 09/29/25   Page 71 of 97

Company investigations. Complaints will be hndled confidentially, to the extent possible.

If you are subject of, or a witness to, discrimination, harassment, sexual harassmen, and/or retaliation, you should report the incident to your supervisor and/or Human Resources.

Reports of sexual harassment may be made verbally or in writing. To inform the Company of any type of harassment, discrimination, and/or retaliation, you may reach out directly to the Human Resources department by phone, e-mail, by filling out a complaint form, letter, or any other means in which you feel comfortable; however, it must be reported. A form for submission of a written complaint is attached to this policy, and you are encouraged to use this complaint form. Employees who are reporting sexual harassment on behalf of other employees should use the complaint form and note that it is on another employee's behalf.

Any intentionally false accusation or report, such as an accusation or a report madein bad faith, will be treated as a serious violation of Morgan & Morgan polcies and may result in discipline, up to termination. Morgan & Morgan encourages every person to report volations, seek consultation, and assist others in complying with this Policy. A complaint that is mad in good faith, but which cannot be substantiated, is not a violation of this Policy.

Remedial actions for violating this policy may be in the form of disciplinary action, up to, and including, termination from Morgan & Morgan.

DocuSign Envelope ID: EF61820D-AFD2-43DD-994B-FDDA78DD3599

**EXHIBIT**

**4**

# MORGAN & MORGAN®

## Employee Acknowledgment Form

I acknowledge receiving a copy of the Morgan & Morgan Employee Handbook. The Handbook describes important information about employment with Morgan & Morgan. I understand that it is my responsibility to read this material and familiarize myself with the policies and procedures of Morgan & Morgan.

I further understand that this Handbook does not guarantee me any specific policies, procedures, rules or length of employment.

Since the information and benefits described within the guidelines are subject to change, I acknowledge that revisions may occur, and I understand that revised information may supersede, modify, or eliminate existing policies. Only the Principals of Morgan & Morgan may adopt any revisions to the Handbook.

I have entered into my employment relationship with Morgan & Morgan voluntarily and acknowledge that there is no specified length of employment. Accordingly, either the Company or I can terminate the relationship at will, with or without cause, at any time. Only the Principals of Morgan & Morgan have the authority to alter, in writing, the terminable-at-will status of any employee.

Furthermore, I acknowledge that the Handbook is not a contract of employment. I have reviewed the Handbook, and I understand that it is my responsibility to read and comply with the Handbook and any revisions made to them, and that any violations may subject me to disciplinary action up through termination.

My signature below indicates that I have read and understand the above statements.

DocuSigned by:

*Tameka Rogers*

08CE270B370D42...

Employee Signature

10/9/2023

Date

Tameka Rogers

Employee Name (Print)

Hi Brian,

I will continue to report information that I feel is revenant until a resolution is established.

A CM from Jeanette's team approached me today stating these words; ( I can share her name later, she wouldn't mind)

Jeanette is trying to form a few people against you to say you are not a good CML. She mentioned two CMs, Irene and Sofia.
She states Irene told her that she and Sofia was called into Jeanette's office where Jeanette then asked them "if someone were to question you about Tameka-are you willing to say she is not good for this team"

Irene rejected the offer and stated Tameka has not done anything to me and I refuse to be a part of this. AND stating that Irene knows what 'they' are trying to do to me.

However, Sofia (which I am not surprised at) agreed to say it when Jeanette asked her if she was willing.

Also, it was indicated that Ms. Galo has made a promise to make Sofia a CML if she goes along with her and that Sofia and Isabella are both going to testify against my performance because Jeanette is coercing them to do so. Isn't this illegal?

Sofia's word certainly can't be taken seriously if you could read the text message, she has sent me concerning Jeanett's behavior. One stated: "I don't know why "they" (Jeanette and Isabella is coming after you—you have done nothing wrong" . She even mentioned the "phrase" me being fired at will ; she got that from Jeanette.

I have tons of info I can share concerning Sofia.


Just thought you needed to know this.

**Tameka Rogers**
**Case Manager**

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



<u>$20B+ Recovered</u> • <u>1,000+ Attorneys</u> • <u>120+ Offices</u>

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.



Q  terogers@forthepeople.com

## Follow Up on Concerns  Inbox ×

**Tameka Rogers x35218** <terogers@forthepeople.com>                    Jul 10, 2024, 9:10 AM
to Brian

Good morning Mr. Nason.

I hope you had a great holiday weekend.

Just wanted to keep you in the loop since I haven't heard back from you since our last conversation. Steve had a great talk with me yesterday. It was needed—and I appreciated his concern and wiliness to speak to me with all that is going on with Ms. Galo and my concerns with her. It was refreshing.  I stated to Steve, "I know she is upset—so I've given her space—and have not asked her any work-related questions"—he understood my point and said he willing to answer any question I may have pertained to work until things calm down. I so appreciate him.

I am still **dealing with some fog** as I know Steve is only looking at this matter from a different perspective and I know he wants the best for this firm, and everyone is in (as he should)—and I know he desire for me to move forward and I completely agree and am willing to do so, my only concern is being given the fair opportunity to evolve in my position as a CML without the retaliation from Ms. Galo. Especially when she has told me in private "I know how to get rid of anyone on my team", and when I have witnessed her conspire to get CM fired because she doesn't like them or if they made her upset"— I have witnessed and heard her and Attorney Stanton conversations. " I have heard her say more than once, "I always get what I want" These bullying statements concerned me then and even more now. Should I be concerned? Am I overthinking this?

Furthermore, I have never heard of any concerns about my personal performance and knowledge of this position until after I submitted my concerns to HR about her . I never received backlash on emails from her and Attorney Isabella until after I submitted my concerns to HR. I have never heard, "maybe we moved you into this position too soon" until I submitted my concerns to HR. Ms. Galo has never walked over to my desk speaking rudely and loudly to me in front of other CMs until I submitted my concerns to HR. I have never seen so much doubt being built around my performance until I submitted my concerns to HR.  And so forth...

I know she is aware of my concerns, and I know she knows I submitted concerns to HR.  Even if it wasn't told to me or confirmed through conversations with other, her behavior and distance says it all.

Karla Perkins on last week made a joke saying, "I am the office snitch—with all of my complaints"

I'm not sure where you are in this investigation, just whenever you're able, I'd like to hear your final thoughts on all of this.  Until then, I will continue to document things I think you should know and filter out those things that are not relevant to this matter.  I am trying to adjust.

I will work hard so Steve Kim can see my efforts in my performance percentages, case progress, etc and my assigned team.

← ⬆ ⓘ 🗑 ✉ ⬇ ⋮                                                                                                23 of many  ‹ › ▬ ▾

102,177

## Re: Settle pending BI   Inbox ×                                                                         ⤢ 🖨 ⬈

**T**    **Tameka Rogers x35218** <terogers@forthepeople.com>              Wed, Jul 24, 9:18 AM ☆ ☺ ↩ ⋮
     to Steve ▾

238

Good morning.

I am well aware of how this works, so this email is not needed from her. Attorney Stanton just released us(her team) last week—in a training she did with her team—on how to settle cases. <u>**This was something she was doing for the team but is no longer doing. She wants us to settle and perform all functions on Cases.**</u>

<u>Jeanette knows this</u>. And she is sending this email with a motive.

I have been in communication with Attorney Staton on these and we both know we are waiting for information before it can be settled. I met with my team yesterday on 8 months and reiterated settling cases that are pending. I am on top of it.

I was able to move one forward yesterday. Still waiting for the others today.

Can WE please come into an agreement, *for now*, that she doesn't communicate with me until things dissolve.
I don't need any **unnecessary, micro-managed- premeditated pressure from her** as I am doing my best to be calm and to move forward from all that has happened...and is happening...

It's too soon for it not to feel like it's retaliation. I love my job. I want my job. I want to prove I can do this job. I just need the unnecessary at this moment. Please understand, Steve.

**Tameka Rogers**
**Case Manager**

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502.
Boston, MA 02110



## Subject: Re: BOS Q3 Sweetener | PSAs & CMLs



**Steve Joyce x32772** <sjoyce@forthepeople.com>                                                                                        Wed, Sep 25, 6:43 PM
to Aaron Van Buskirk x35849, Isabella Stanton x35850, Alexander Nee x35856, Justin Herrmann x25919, Jeanette Galo x32871, Tameka Rogers x35218, Steve Kim x31741, Dillon Brozyna x3180, Yitzi Steier x4707, Garrett Lee x8610, Ryan Lang x8619, Brandon Gavin x32768 ▾

Team,

I just pulled the numbers here, as we have 3 more business days in the quarter. Let me know if anything looks inaccurate when comparing to your respective Dashboards:

*Q3 Sweetener for $4,000.00* 💰 💸
*1. Your team banks over 30 cases (measured by PSA banks, where PSA is Principal Attorney on the Fee record)*
*2. Your team 8 Month % needs to be 15% or lower*

**Isabella & Tameka**
Banks: 34 ✅
*Settled Not Banked: 7*
8 Month %: 12%

**Aaron:**
Banks: 33 ✅
*Settled Not Banked: 21*
8 Month %: 13%

**Justin & Jeanette:**
Banks: 22/30
Settled Not Banked: 21
8 Month %: 17%

**Alex:**
Banks: 9/30
Settled Not Banked: 0
8 Month %: 20

Still time to reel in Settled Not Banked and drive down the 8 Month %

Thanks,
Steve

**Steve Joyce**
**Director of Regional Ops**

T: (781) 464-4113
F: (781) 464-4163
56 Exchange Terrace, Ste 500,
Providence, RI 02903

 **Tameka Rogers x35218** <terogers@forthepeople.com>
to Brian, Steve ▾

Tue, Oct 1, 12:54 PM    ☆        ↩    ⋮

Hi Brian,

Below is the email I received from Attorney Isabella, yet again, accusing me of mishandling cases. All the actions she is accusing me of are the ones she instructed me to do. These consistent types of emails are distressing, and she continues to build doubt around my performance to those she constantly cc to be a part of these types of emails. I responded twice; along with a request to be removed from her team, but Steve Kim has not responded to my request.

Here is proof that her allegations are incorrect:

She mailed her team a list of 10 month cases with instructions; and I followed her written instructions of the cases below for example,

**Dennis Maina;** she and I had multiple discussions with this case. I tried to flip the case, but it was denied by her twice. I even told her the client will not accept any offer on this case outside of court.  On 8/6 Ryan Lang emailed me asking me to follow up on a few cases, Dennis Maina was on that list. I responded on 8/20 to him, Isabella and a few other that the top offer was 10k; no response. In the same email, I informed him :" I have conveyed this info to the Attorney." (no response)

On 8/23, I emailed Isabella in teams confirming the offer of 10k again, no response, after the read the message. The release is sitting in the file because the client rejects the offer, and he wants to take it to court. I tried multiple times to bring closure to this case. NO one responded

**Michael Berry** on 9/13 she rejected the TD after she gave me instructions to TD the case if the adjuster will not increase offer to 10k. The adjuster refused to increase the offer, I TD the case the client took the $3,900 top offer. Per Attorney Staton's instructions.

**Craig Robertson:** She instructed me to mark his case as "settled" and not to use "Pending BI Settlement" status on cases. And if the adjuster refused to raise offer, to TD the case.

Lastly, she mentioned **Esther Saintime**, she approved the settlement in 5/26 in teams and then got upset because I sent her a release that she did not see until later because at that time, she was banking all cases for all of her CMs until we got the training. So, I had to screenshot her the message in teams-–where she approved the settlement in order her to calm down, but yet she states she did not approve of the settlement—when in fact she did.

**From:** Isabella Stanton x35850 <istanton@forthepeople.com>
**Sent:** Thursday, September 26, 2024 1:40 PM
**To:** Tameka Rogers x35218 <terogers@forthepeople.com>
**Cc:** Ryan Lang x8619 <rlang@forthepeople.com>; Steve Kim x31741 <skim@forthepeople.com>
**Subject:** cases marked as settled incorrectly

Good afternoon,

Please be advised that a case is only settled when the attorney and client approve the settlement amount, based on information about bills, injuries, treatment, and any outstanding liens. NOT when the adjuster says that they are giving a top offer. Remember we address this issue with this particular case 15008014 - Saintime, Esther, where I did not approve the settlement amount yet, you sent the release to the client and adjuster.

Below see three cases you have marked as settled ( which are not truly settled)

**14830899 - Maina, Dennis vs Cruz, Jose**- this case has only 1 damage entered from comeback but in the file,  I  see an  MRI from Rayus, where is the bill and why is Rayus not updated in the roles? In the file, I see after visit summary with a doctor, is related? Where are the bills for this visit? There are 3 negotiations entered in the file.

- Initial demand
- And then 2 counter demands one for 8k and the other for 10k, can you please show when did I approve or ask to counter-demand this amount? Or are these counter offers?

I see a release in the file for 10,000, did you ask the client to sign this?



Call: Called the client                                          Aug 9  ▼

Tameka Rogers logged a call

Status                          Associated Object Name
Completed                       Maina, Dennis vs Cruz, Jose

Priority
Normal

Description
Called client to verify treatment, client states he did see an skin doctor once, he will send over her info for the file. Client rejects 10k offer ; he wants to go for the full 50k

**13718242 - Berry, Michael vs Tulsi Vadodaria**- this case is also marked as settled, why? Did you enter offers as counter demands in this case as well?  Why is there a release in the file for 3,900? Did you send this release to the client for signature? When did the client or I approve this amount?  Why is there a withdrawal letter in the file? How did the offer get from 2,400 to 3,900? Did you negotiate with the adjuster without me approving it?
Why did you tell the client that if the offer did not increase, we will TD the case and let him get everything?
Only on cases where bills are low and paid by pip, there are no liens,  the client is pain-free, and the offer is very low, we do this type of thing.  this is a conversation that the attorney should have with the client once the TD is approved. I don't see a pip log in the file.

**14774851 - Robertson, Craig vs Eric Colon**- In this case, you marked it as settled only because the adjuster gave the top offer.
In this case, the pip log shows payment for $7,250.00, and the damages in the file are duplicated showing higher bills.

Damages

mail.google.com/mail/u/0/popout?ver=1lr71gbo32spl&msg=%23msg-f%3A1811264179242728438.attid=0.1

## Subject: Re: cases marked as settled incorrectly



**Tameka Rogers x35218** <terogers@forthepeople.com>                                                            Thu, Sep 26, 2:24 PM
to Isabelle Stanton x35850, Ryan Lang x8619, Steve Kim x31741 ▾

Attorney-

Please allow me to make a small correction concerning your statement.

Concerning **Esther Saintime**, you did approve the settlement for this client on May 22, 2024.  On 8/9/2024, I sent you a screenshot of the message as a reminder to you were aware of the settlement, when you stated in all caps, you did not approve, which in fact you did.

Concerning **Dennis Mania**; I brought this case to your attention several times, a few times, I was trying to see if we could flip it because of his head injury. On 8/23 I informed you of their top offer of 10k.

**Michael Berry**, you sent me a list of case with instructions, Michael Berry was on that list. A pip log was requested. You stated in your instructions via email, if the adjuster will not increase offer to 10k, TD case. I printed off those instructions from the email you sent.

**Craig Robertson**, he was also on the list of cases you provided instructions and you stated: "change the matter status to settled" try to get adjuster to settle for 5k if no TD" These were your instructions.

Lastly, when I usually get Release from an adjuster, I marked the cases "Pending BI settlement" you told me NOT to make cases with that status but to mark them as "settled". This is why you see "settled" I followed your instructions.

**Tameka Rogers**
Case Manager

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



$20B+ Recovered • 1,000+ Attorneys • 120+ Offices
A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.



Q  terogers@forthepeople.com

## Concerns for Today 7/26/24    Inbox ×

**Tameka Rogers x35218** <terogers@forthepeople.com>    Fri, Jul 26, 5:50 PM
to Brian

Good evening.

I wanted to follow up on my email sent to you earlier today, highlighting another example of how Isabella continues to call me out in emails with all higher mgt/attorneys included, in error—with the intention to invoke doubt around my performance, to harass and to humiliate. The way she does this weekly creates such a hostile environment, when she can simply communicate with me directly to get an understanding before she blasts me in an email with management included. It was my desire to respond with integrity, calmness as I provided information to prove again, her allegations were not true.

Some of their responses have been marked out for deletion, which is strange.

Have a great weekend.

mMy

**Tameka Rogers**
**Case Manager**

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110





**$20B+ Recovered • 1,000+ Attorneys • 120+ Offices**

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

---

**From:** Tameka Rogers x35218 <terogers@forthepeople.com>
**Sent:** Friday, July 26, 2024 12:39 PM
**To:** Brian Nason x1804 <BNason@forthepeople.com>
**Subject:** Isabella Stanton/Concern

Brian-

I'd like to forward you a thread this morning with Isabella calling me out "incorrectly" again with Steve K, Steve J, and Ryan L all in a thread. Thankfully the attorneys stepped in provided corrections to her in the thread, but this is starting to feel like harassment and it's becoming too much...

Every other day, this is happening as I told you yesterday.

Let me know your thoughts.

**Tameka Rogers**
**Case Manager**

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



**$20B+ Recovered • 1,000+ Attorneys • 120+ Offices**

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any. is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

...

## Subject: IT

 **Tameka Rogers x35218** <terogers@forthepeople.com>                                          Thu, Aug 22, 9:25 AM
to Brian Nason x1804, Steve Kim x31741 ▾

Good morning.


IT wanted me to reach out concerning a ticket I submitted because I am not longer able to review my team's progress on CM Lead lit page/link and other link I had access to. They advised me to reach out to you for reasons I'm no longer listed as their Lead and permission restore, if applicable. Have I been quietly removed from my CM Lead duties? I'd love an update moving forward. It's only fair that I know.....



Blessings,



**Tameka Rogers**
**Case Manager**

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110



<u>$20B+ Recovered</u> • <u>1,000+ Attorneys</u> • <u>120+ Offices</u>

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

Q  terogers@forthepeople.com                                          ✕  ⇅

← ⬆ ⓘ 🗑 | ✉ ⬇ ⋮                                                    44 of many  ‹  ›  ▬ ▾

**From:** Tameka Rogers x35218 <<u>terogers@forthepeople.com</u>>
**Sent:** Friday, August 2, 2024 11:09 AM
**To:** Brian Nason x1804 <<u>BNason@forthepeople.com</u>>
**Cc:** Steve Kim x31741 <<u>skim@forthepeople.com</u>>
**Subject:** Boston Team/Resource Chat

Good morning Brian.

As you know, my team and myself--was recently deleted from the Boston Team Chat by Jeanette Galo, my supervisor, where we all communicate as a team and ask questions, drop resources about the market and case management, etc. Well. today my team informed me that all were added back with the exception of myself, which I do not understand why I am left out, when WE ALL ARE ON THE SAME TEAM, working towards the same goal.

How am I supposed to perceive this?

Maybe you can help one final time....

Waiting to hear from you....

**Tameka Rogers**
Case Manager

T: (770) 299-7705
F: (770) 299-7755
155 Federal Street, Suite 1502,
Boston, MA 02110

**MORGAN & MORGAN**
AMERICA'S LARGEST INJURY LAW FIRM

**$20B+ Recovered** • **1,000+ Attorneys** • **120+ Offices**

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

CONFIDENTIALITY NOTICE: This e-mail message including attachments, if any, is intended for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure, or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. Thank you.

terogers@forthepeople.com meeting

6 of 26

**From:** Tameka Rogers x35218 <terogers@forthepeople.com>
**Sent:** Tuesday, September 17, 2024 11:27 AM
**To:** Brian Nason x1804 <BNason@forthepeople.com>
**Subject:** Re: Meeting Request

Good morning. I am still writing out all the details of yesterday's meeting.

I did get a chance to speak with each CM on my team that met with her, and all seem disparage about the meeting and stressed what they felt and of course, denied and confirmed that they ever said; they told her— I told them to never talk to her.

It is these types of untrue statements that have caused a lot of confusion at work with me and my team—because previous statements like this have been made by her in the past.  To hear members of my team say, " it sounds like she's trying to set you up, and the reason she can say bold things to you is because "they " are going to protect her and not believe you.

I've been emailing my concerns since June—I have tried my best to move past everything that has happened without escalating it and in many attempts,  strived to work with her and my attorney even when I knew they are bringing up false narratives about my performance and being attacked and humiliated in emails, daily.

Even yesterday, when she called me into her office to talk, I was so willing to walk away from that meeting hopeful, but when I saw the politics she tried to play with me against my team and team against me, and the questions she was asking and the speculations she gave that someone what potentially listening on the phone or I was being recorded—and her boldness to say HR is not going to help you, etc.—It all felt so dark and uncomfortable.

I really need to talk with you.


I will continue to write out all the details. Please let me know when you are available.


Regards,


**Tameka Rogers**
Case Manager

T: (770) 299-7705
F: (770) 299-7755

# Evidence of Outstanding Performance for the last quarter of Employment.
# (Continual Rebuttal Statement)

This evidence is to prove that their final position statement in **Section II : Charging Party's Employment with Morgan & Morgan Area B: is false and misleading**.

Morgan and Morgan wrote in their Final Position Statement that due to increased demands of my new role as Case Manager Lead, I was unable to meet expectations as a Case Manager Lead and my performance fell short. They also mentioned I was given a number of cases to handle and that I could not handle the increased demand.

My last performance and bonus opportunity was presented on **July 17, 2024**. This opportunity was given to all Attorney and their Case Manager Lead by Aaron Van Buskirk, Steve, Kim and Dillion Brozyna.

Below you will find emails to prove my statement to be true and Morgan and Morgan statements to be false, misleading and lack integrity.

The email is broken down into individual teams including each Attorney and their Case Manager Leads. I am on the team with Isabella Stanton as you see our names listed as (Isabella Stanton/Tameka Rogers)

The performance goal was to settle or bank 30 cases for the quarter and maintain a below 151% or lower over all score which then indicated outstanding Case Management and settlement of cases.

The second portion of the email dated **September 25, 2024** ended the performance for the quarter for each team. This email was sent to show which Attorney and their Case Manager Lead, lead their teams into outstanding performance to receive a $4000.00 bonus check per Attorney and Case Manager Lead.

The green check marks show which team met the performance goal and the amount of bonus we received.

**Jeanette Galo's** and her immediate Attorney's team failed to perform at the level indicated in the email and did not meet the outstanding performance bonus of $4000.00.

Attorney Isabella Stanton and I exceeded the amount of cases settled and cases that met performance requirements totaling at 34 (30 was required) with a 12% overall case performance which was 3% lower than what was requested from us.

I received the full $4000.00 bonus the week I resigned under construction discharge, with an additional $1650.00 for cases that I managed and flipped to litigation for court. Totaling at $5650.00 total payout on my last two checks with Morgan and Morgan. (check stubs were submitted in first initial rebuttal statement)

# Evidence of Outstanding Performance for the last quarter of Employment.
# (Continual Rebuttal Statement)

This evidence is to prove that their final position statement in **Section II : Charging Party's Employment with Morgan & Morgan Area B: is false and misleading**.

Morgan and Morgan wrote in their Final Position Statement that due to increased demands of my new role as Case Manager Lead, I was unable to meet expectations as a Case Manager Lead and my performance fell short. They also mentioned I was given a number of cases to handle and that I could not handle the increased demand.

My last performance and bonus opportunity was presented on **July 17, 2024**. This opportunity was given to all Attorney and their Case Manager Lead by Aaron Van Buskirk, Steve, Kim and Dillion Brozyna.

Below you will find emails to prove my statement to be true and Morgan and Morgan statements to be false, misleading and lack integrity.

The email is broken down into individual teams including each Attorney and their Case Manager Leads. I am on the team with Isabella Stanton as you see our names listed as (Isabella Stanton/Tameka Rogers)

The performance goal was to settle or bank 30 cases for the quarter and maintain a below 151% or lower over all score which then indicated outstanding Case Management and settlement of cases.

The second portion of the email dated **September 25, 2024** ended the performance for the quarter for each team. This email was sent to show which Attorney and their Case Manager Lead, lead their teams into outstanding performance to receive a $4000.00 bonus check per Attorney and Case Manager Lead.

The green check marks show which team met the performance goal and the amount of bonus we received.

**Jeanette Galo's** and her immediate Attorney's team failed to perform at the level indicated in the email and did not meet the outstanding performance bonus of $4000.00.

Attorney Isabella Stanton and I exceeded the amount of cases settled and cases that met performance requirements totaling at 34 (30 was required) with a 12% overall case performance which was 3% lower than what was requested from us.

I received the full $4000.00 bonus the week I resigned under construction discharge, with an additional $1650.00 for cases that I managed and flipped to litigation for court. Totaling at $5650.00 total payout on my last two checks with Morgan and Morgan. (check stubs were submitted in first initial rebuttal statement)

## MORGAN & MORGAN

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

**Pay Statement**

| | |
|---|---|
| Period Start Date | 09/29/2024 |
| Period End Date | 10/12/2024 |
| Pay Date | 10/18/2024 |
| Document | 137285900 |
| **Net Pay** | **$1,881.27** |

### Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

### Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $1,650.00 | $9,700.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $1,206.40 |
| PTO Payout | 29.480000 | $622.03 | $622.03 |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | $21,966.18 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours  45.480000

### Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K EE Pretax | $2,609.63 | Yes | $78.29 | $238.80 | $0.00 | $0.00 |
| AD&D | $2.08 | No | $2.08 | $43.68 | $0.00 | $0.00 |
| Child AD&D | $0.06 | No | $0.06 | $1.98 | $0.00 | $0.00 |
| Child Life | $0.42 | No | $0.42 | $13.32 | $0.00 | $0.00 |
| Dental | $50.82 | Yes | $50.82 | $1,101.24 | $0.00 | $0.00 |
| EE Sup Life | $8.35 | No | $8.35 | $175.35 | $0.00 | $0.00 |
| Medical | $51.36 | Yes | $51.36 | $1,057.14 | $143.05 | $3,082.80 |
| Vision | $9.26 | Yes | $9.26 | $210.21 | $0.00 | $0.00 |

### Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $2,419.90 | $336.61 | $2,767.89 |
| Employee Medicare | $2,498.19 | $36.22 | $550.54 |
| Social Security Employee Tax | $2,498.19 | $154.89 | $2,354.05 |

### Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 0.0000 | 29.8000 |

### Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $1,881.27 |
| Total | | $1,881.27 |

### Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $2,609.63 | $2,419.90 | $527.72 | $200.64 | $1,881.27 |
| YTD | $40,337.07 | $37,729.68 | $5,672.48 | $2,841.72 | $31,822.87 |

## MORGAN & MORGAN

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

**Pay Statement**

| | |
|---|---|
| Period Start Date | 09/29/2024 |
| Period End Date | 10/12/2024 |
| Pay Date | 10/18/2024 |
| Document | 137286198 |
| **Net Pay** | **$3,842.56** |

### Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

### Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $5,650.00 | $15,350.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $1,206.40 |
| PTO Payout | 0.000000 | $0.00 | $622.03 |
| Regular-Salary | 0.000000 | $0.00 | $21,966.18 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours  0.000000

### Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K EE Pretax | $5,650.00 | Yes | $169.50 | $408.30 | $0.00 | $0.00 |
| AD&D | $0.00 | No | $0.00 | $43.68 | $0.00 | $0.00 |
| Child AD&D | $0.00 | No | $0.00 | $1.98 | $0.00 | $0.00 |
| Child Life | $0.00 | No | $0.00 | $13.32 | $0.00 | $0.00 |
| Dental | $0.00 | Yes | $0.00 | $1,101.24 | $0.00 | $0.00 |
| EE Sup Life | $0.00 | No | $0.00 | $175.35 | $0.00 | $0.00 |
| Medical | $0.00 | Yes | $0.00 | $1,057.14 | $0.00 | $3,082.80 |
| Vision | $0.00 | Yes | $0.00 | $210.21 | $0.00 | $0.00 |

### Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $5,480.50 | $1,205.71 | $3,973.60 |
| Employee Medicare | $5,650.00 | $81.93 | $632.47 |
| Social Security Employee Tax | $5,650.00 | $350.30 | $2,704.35 |

### Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 0.0000 | 29.8000 |

### Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $3,842.56 |
| Total | | $3,842.56 |

### Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $5,650.00 | $5,480.50 | $1,637.94 | $169.50 | $3,842.56 |
| YTD | $45,987.07 | $43,210.18 | $7,310.42 | $3,011.22 | $35,665.43 |

**MORGAN & MORGAN**

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

| Pay Statement | |
|---|---|
| Period Start Date | 09/15/2024 |
| Period End Date | 09/28/2024 |
| Pay Date | 10/04/2024 |
| Document | 135761181 |
| **Net Pay** | **$3,806.77** |

## Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

## Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $4,000.00 | $8,050.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 8.000000 | $168.80 | |
| Paid Time Off | 8.000000 | $168.80 | |
| Paid Time Off | 8.000000 | $168.80 | $1,206.40 |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | $21,628.58 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours  64.000000

## Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K EE Pretax | $5,350.40 | Yes | $160.51 | $160.51 | $0.00 | $0.00 |
| AD&D | $2.08 | No | $2.08 | $41.60 | $0.00 | $0.00 |
| Child AD&D | $0.06 | No | $0.06 | $1.92 | $0.00 | $0.00 |
| Child Life | $0.42 | No | $0.42 | $12.90 | $0.00 | $0.00 |
| Dental | $50.82 | Yes | $50.82 | $1,050.42 | $0.00 | $0.00 |
| EE Sup Life | $8.35 | No | $8.35 | $167.00 | $0.00 | $0.00 |
| Medical | $51.36 | Yes | $51.36 | $1,005.78 | $143.05 | $2,939.75 |
| Vision | $9.26 | Yes | $9.26 | $200.95 | $0.00 | $0.00 |

## Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $5,078.45 | $859.98 | $2,431.28 |
| Employee Medicare | $5,238.96 | $75.97 | $514.32 |
| Social Security Employee Tax | $5,238.96 | $324.82 | $2,199.16 |

## Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 4.0000 | 29.8000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $3,806.77 |
| Total | | $3,806.77 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $5,350.40 | $5,078.45 | $1,260.77 | $282.86 | $3,806.77 |
| YTD | $37,727.44 | $35,309.78 | $5,144.76 | $2,641.08 | $29,941.60 |

**MORGAN & MORGAN**

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

| Pay Statement | |
|---|---|
| Period Start Date | 09/01/2024 |
| Period End Date | 09/14/2024 |
| Pay Date | 09/24/2024 |
| Document | 134317321 |
| **Net Pay** | **$527.63** |

## Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | |
|---|---|
| Employee Number | 1008492 |
| SSN | XXX-XX-XXXX |
| Job | Case Manager |
| Pay Rate | $21.1000 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | MM Atlanta Mngmt. Inc BW |
| Location | Alpharetta - AGN |
| Legal Entity | ATLANT - Atlanta |
| Division | LGSVS - Legal Services |
| Department | PITPL - PI - Pre-Suit |
| Sub Dept | CS - Case Staff |

## Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | | $750.00 | $4,050.00 |
| Holiday | 0.000000 | $0.00 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $700.00 |
| Regular-Salary | 0.000000 | $0.00 | $20,784.58 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours 0.000000

## Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| AD&D | $0.00 | No | $0.00 | $39.52 | $0.00 | $0.00 |
| Child AD&D | $0.00 | No | $0.00 | $1.86 | $0.00 | $0.00 |
| Child Life | $0.00 | No | $0.00 | $12.48 | $0.00 | $0.00 |
| Dental | $0.00 | Yes | $0.00 | $999.60 | $0.00 | $0.00 |
| EE Sup Life | $0.00 | No | $0.00 | $158.65 | $0.00 | $0.00 |
| Medical | $0.00 | Yes | $0.00 | $954.42 | $0.00 | $2,796.70 |
| Vision | $0.00 | Yes | $0.00 | $191.69 | $0.00 | $0.00 |

## Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $750.00 | $165.00 | $1,571.30 |
| Employee Medicare | $750.00 | $10.87 | $438.35 |
| Social Security Employee Tax | $750.00 | $46.50 | $1,874.34 |

## Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 4.0000 | 49.8000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $527.63 |
| Total | | $527.63 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $750.00 | $750.00 | $222.37 | $0.00 | $527.63 |
| YTD | $32,377.04 | $30,231.33 | $3,883.99 | $2,358.22 | $26,134.83 |

**Tameka Rogers**
Case Manager

T: (770) 299-7705
F: (770) 299-7755
11605 Haynes Bridge Road, Suite 490,
Alpharetta, GA 30009



$20B+ Recovered • 1,000+ Attorneys • 120+ Offices

A referral is the best compliment. If you know anyone that needs our help, please have them call our office 24/7.

From: Tameka Rogers x35218 <terogers@forthepeople.com>
Sent: Wednesday, June 26, 2024 10:58 AM
To: Brian Nason x1804 <BNason@forthepeople.com>
Subject: Attorney Isabella Stanton

So today, Attorney Stanton used signs in her message to me in teams; to stimulate she is yelling at me.  Mind you, she has done this before to CMs on my team and complaints have been made, by Karla P and Sofia to myself and to Jeanette. Karla actually came to be crying before stating Isabella keeps yelling at her. Not right.

Today, I guess it was my turn. I explained to her in the most professional manner, the reason for my delay in responding was to the fact I was multitasking, and I wasn't able to give a response like she desired. I've always done it this way—and it has never been an issue. I further stated to her, I am not a child, and I would appreciate if she talked to in that manner. She responded, "I can use any expression I want"...

I said to her, "you're right, you can use any expression you want-- but some are unprofessional and can come across as hostile..."
She replied, "I don't have the authority to say that to her..." and that she was going to call a meeting with Steve.

 I did send him an email before she stated that, but I just wanted to let you know as well.

Mr. Nason, it is so much I haven't even stated in my complaint to you. There is so much going on, that's not right...at the end of the day, I am trying to do my job so I can support my family, but the environment and tone lately is unwelcoming....

Just keeping you informed.

**MORGAN & MORGAN**

MM Atlanta Management Inc
20 N. Orange Ave., Suite 1600
Orlando, FL 32801
901-333-1804

| Pay Statement | |
|---|---|
| Period Start Date | 09/01/2024 |
| Period End Date | 09/14/2024 |
| Pay Date | 09/20/2024 |
| Document | 133783067 |
| Net Pay | $1,388.90 |

## Pay Details

**TAMEKA E ROGERS**
122 LEGACY OAKS CIRCLE
ROSWELL, GA 30076
USA

| | | | |
|---|---|---|---|
| Employee Number | 1008492 | Pay Group | MM Atlanta Mngmt. Inc BW |
| SSN | XXX-XX-XXXX | Location | Alpharetta - AGN |
| Job | Case Manager | Legal Entity | ATLANT - Atlanta |
| Pay Rate | $21.1000 | Division | LGSVS - Legal Services |
| Pay Frequency | Biweekly | Department | PITPL - PI - Pre-Suit |
| | | Sub Dept | CS - Case Staff |

## Earnings

| Pay Type | Hours | Current | YTD |
|---|---|---|---|
| Bonus Pay | 0.000000 | $0.00 | $3,300.00 |
| Holiday | 8.000000 | $168.80 | $728.80 |
| Hourly | 0.000000 | $0.00 | $5,009.00 |
| Overtime | 0.000000 | $0.00 | $840.66 |
| Paid Time Off | 0.000000 | $0.00 | $700.00 |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | |
| Regular-Salary | 8.000000 | $168.80 | $20,784.58 |
| Retro Pay | 0.000000 | $0.00 | $264.00 |

Total Hours 80.000000

## Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| AD&D | $2.08 | No | $2.08 | $39.52 | $0.00 | $0.00 |
| Child AD&D | $0.06 | No | $0.06 | $1.86 | $0.00 | $0.00 |
| Child Life | $0.42 | No | $0.42 | $12.48 | $0.00 | $0.00 |
| Dental | $50.82 | Yes | $50.82 | $999.60 | $0.00 | $0.00 |
| EE Sup Life | $8.35 | No | $8.35 | $158.65 | $0.00 | $0.00 |
| Medical | $51.36 | Yes | $51.36 | $954.42 | $143.05 | $2,796.70 |
| Vision | $9.26 | Yes | $9.26 | $191.69 | $0.00 | $0.00 |

## Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $1,576.56 | $56.15 | $1,406.30 |
| Employee Medicare | $1,576.56 | $22.86 | $427.48 |
| Social Security Employee Tax | $1,576.56 | $97.74 | $1,827.64 |

## Paid Time Off

| Plan | Current | Balance |
|---|---|---|
| Paid Time Off | 4.0000 | 49.8000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxxx5700 | Checking | $1,388.90 |
| Total | | $1,388.90 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $1,688.00 | $1,576.56 | $176.75 | $122.35 | $1,388.90 |
| YTD | $31,627.04 | $29,481.33 | $3,661.62 | $2,358.22 | $25,607.20 |

# Evidence of Outstanding Performance for the last quarter of Employment.
# (Continual Rebuttal Statement 2)

This evidence is to prove that their final position statement in **Section II : Charging Party's Employment with Morgan & Morgan Area D: is false and misleading**.

Morgan and Morgan wrote in their Final Position Statement that I flooded Mr. Nason with emails, which is true. Mr. Nason asked me to send him emails about everything that was going on between me and Jeanette Galo and Isabella Standon. Therefore, by his request, I did just that. In Morgan & Morgan's final position statement, **in Section II Area D;** they inserted an email from me to Mr. Brian Nason, which they call "minor interactions". The interaction was not minor. I was under a lot of stress because everything I did with my cases were being falsely monitored and I was accused of making mistakes I was not making. I mentioned in the initial rebuttal statement, that Isabella would ask me, for example, to change a status on the case, and she knew it was incorrect—only to drag me into an email with a group of attorneys and upper-management to call me out as if I was making an error due to poor case management. This type of retaliation, manipulation and harassment went on for months and Brian Nason (HR) never brought a resolution to my situation but only privately complained about me to Attorney Isabella Stanton  and Jeanette Galo, stating I was emailing him too much, which is how they included this email in their final position statement. He would forward each email I sent him---to them, in mockery of the stress they put my under due to their severe retaliation and humiliation. Ms. Galo told me to stop emailing those "love letters" to Mr. Nason—because he is tired of you sending them to him. She also told me, each I email I send to him, he sends to her, Steve Kim and Isabella Stanton. That is mockery of the retaliation I was enduring.

Here is the insert from Morgan & Morgan's final position statement:

## D.    Charging Party Voluntarily Resigns from Employment

Despite further efforts from Ms. Galo and Mr. Nason to assist Charging Party, Charging
arty failed to consistently manage both her own and her team's caseloads. She regularly made
iistakes, for example by entering the wrong insurance liability limits into the case file – mistakes
·hich she then blamed on being overworked or dismissed completely as "false narratives." Instead
f communicating directly with Ms. Galo or Attorney Stanton, Charging Party also started to
ɔntact Mr. Nason directly to "update" him that, for example, Attorney Stanton was accusing her
f poor case management or that Ms. Galo was not helping her develop in her role. She flooded
Ir. Nason's inbox with recaps of minor interactions with Attorney Stanton or Ms. Galo, once
ʒain focusing on the workplace drama instead of doing her work, for example:

Good day Brian.

I'm not sure where if Attorney Stanton will say, my response to her was rude in the attached screenshot,
because of the exclamation point, but it wasn't. I was given a Quick Response option as I was preparing
to respond. It gave 3 options to choose from:
"Will do!" "
I'm on i
....and another one.

I chose ; "Will do!" as my response to her.

I wanted you to know just in case she wanted to report it as rude. It was not my attention. I chose the first
option given to me. It sounds like excitement to me.

Just wanted you to know.

Below you will find an email I sent to Mr. Brian Nason ; which includes a concern made with
Isabella yelling at Case Managers through emails. My quick response generated by the email
was given to Isabella—and she reported that I screamed at her, AFTER I submitted the email
below to Brian Nason.